984 P.2d 78

STATE of Hawai'i, Plaintiff–Appellee,

v.

William KOTIS, Defendant–Appellant Director of Health, Department of Health, State of Hawai'i, Party In Interest–Appellee

No. 18823.

Supreme Court of Hawai'i.

July 13, 1999.

Reconsideration Denied Aug. 27, 1999.

David Glenn Bettencourt, on the briefs, Honolulu, for the defendant-appellant William Kotis.

Donn Fudo, Deputy Prosecuting Attorney, for the plaintiff-appellee State of Hawai'i.

Blair Goto and Heidi M. Rian, Deputy Attorneys General, for the party in interest–appellee Director of Health, Department of Health of the State of Hawai'i.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant William Kotis appeals from the order of the circuit court granting the motion of the director of health (the director) for an order authorizing the involuntary administration of antipsychotic medications. On appeal, Kotis argues that: (1) the circuit lacked authority to issue its order; (2) the circuit court's order violated Kotis's constitutionally-protected interest in being free from the involuntary administration of antipsychotic medication because, in the alternative, (a) it is always constitutionally prohibited to authorize such involuntary medication of a defendant immediately prior to, and/or during trial, or (b) the circuit court erroneously applied the burden of proof by the "preponderance of the evidence" rather than by "clear and convincing evidence"; (3) the circuit court erred in taking judicial notice of certain facts in the record; and (4) there was an insufficient evidentiary basis to support the circuit court's findings of fact (FOFs) that (a) due to his mental illness, Kotis posed a danger to himself and to others, (b) the proposed treatment plan was medically appropriate and essential, and (c) alternative treatments had been inadequate.

Kotis's assertions that the circuit court lacked authority to issue an order authorizing the director to administer involuntary medication and that a circuit court may never order the involuntary administration of antipsychotic medications to a defendant before

or during trial are without merit. We agree with Kotis that the burden of proof applicable to the Director's motion was proof by clear and convincing evidence. However, because the record does not indicate which burden of proof the circuit court applied with respect to the evidence, this court cannot presume that the circuit court erred. Furthermore, although we agree that the circuit court apparently erred in taking judicial notice of certain "facts," the mistake did not rise to the level of plain error. Finally, we disagree that the circuit court lacked substantial evidence to support its FOFs. Accordingly, we affirm the circuit court's order.

## I. BACKGROUND

On September 10, 1992, Kotis was indicted for (1) murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5(1) (1993),[1] (2) kidnapping, in violation of HRS § 707–720(1)(e) (1993),[2] and (3) terroristic threatening in the first degree, in violation of HRS § 707–716(1)(d) (1993).[3] The charges arose from an incident that oc-

curred on or about September 7, 1992, in which Kotis allegedly threatened his wife, Lynne Kotis, and her companion, Gregory Wittman, with a knife, restrained Lynne with intent to terrorize her, and caused Lynne's death while in possession of a firearm.

On September 28, 1993, Kotis filed a notice of his intention to rely on the defense of lack of penal responsibility. On October 19, 1993, he filed a motion for a mental examination by a three-member panel.[4] Kotis's motion was granted. Each of the three examiners, Elizabeth Adams, M.D., Peter Bianchi, Ph.D., and Olaf Gitter, Ph.D., reported that Kotis was unfit to proceed to trial. Each of the examiners also opined that Kotis was dangerous to himself and to others due to his mental illness. At the February 16, 1994 hearing on the motion, the prosecution conceded that Kotis was unfit to proceed to trial. In a written order filed on February 17, 1994, the circuit court found Kotis unfit to proceed to trial, pursuant to HRS § 704–405 (1993),[5] and therefore suspended the proceedings pursuant to HRS § 704–406 (1993).[6] In a

1. HRS § 707–701.5 provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. HRS § 707–720 provides in relevant part that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: ... [t]errorize that person or a third person[.]"

3. HRS § 707–716 provides in relevant part that "[a] person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: ... [w]ith the use of a dangerous instrument."
 HRS § 707–715 (1993) provides in relevant part:
 **Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person ... or to commit a felony:
 (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

4. HRS §§ 704–404(1) and (2) (1993) provide in relevant part that
 [w]henever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, ... the court

may immediately suspend all further proceedings in the prosecution.... Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners to examine and report upon the physical and mental condition of the defendant....

5. HRS § 704–405 provides:
 **Determination of fitness to proceed.** When the defendant's fitness to proceed is drawn in question, the issue shall be determined by the court. If neither the prosecuting attorney nor counsel for the defendant contests the finding of the report filed pursuant to section 704–404, the court may make the determination on the issue. When the report is received in evidence upon such hearing, the party who contests the finding thereof shall have the right to summon and to cross-examine the persons who joined in the report or assisted in the examination and to offer evidence upon the issue.

6. HRS § 704–406(1) provides in relevant part that, "[i]f the court determines that [a] defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended, except as provided in section 704–407, and the court shall commit the defendant to the custody of the director of health to be placed in an appropriate institution for detention, care, and treatment...."

subsequent order, the circuit court committed Kotis to the custody of the director.[7]

On September 7, 1994, during a hearing pertaining to a proposed transfer of the location of Kotis's confinement, *see supra* note 7, the director orally indicated that he intended to file a motion requesting an order authorizing him to medicate Kotis involuntarily. The director requested that the circuit court appoint a guardian ad litem (GAL) for Kotis to make a recommendation on the motion. The circuit court agreed to appoint a GAL, although it also made clear that Kotis's court-appointed defense counsel remained Kotis's advocate in the matter. The circuit court ordered the director to provide an outline of the specific course of medication being recommended for Kotis, together with a summary of the side effects associated with the drugs proposed for use in his treatment.

The circuit court's written order appointing a GAL was filed on September 12, 1994. On November 25, 1994, the GAL filed an *ex parte* motion for an order appointing an independent medical examiner to assist him in preparing his report to the circuit court. The circuit court granted the motion in an order apparently filed on the same day, appointing Vit U. Patel, M.D., as an examiner "to assist the [GAL] by rendering information, and by performing other services reasonably related to the [director's] motion for an order authorizing the administration of involuntary medication."

On December 27, 1994, the GAL submitted a report to the circuit court, noting, *inter alia*, that the basis of the director's claim of Kotis's dangerousness was vague and should be subjected to "further inquiry." Nevertheless, the GAL approved the treatment plan proposed by the director and recommended that it "be instituted, subject to review as needed, based on any adverse health affects to Mr. **Kotis**." (Emphasis in original.) The GAL attached Dr. Patel's report, which generally approved the course of treatment offered by the director, subject to "some concerns" regarding the use of the medications lithium and Mellaril.

The director's written motion requesting an order authorizing involuntary medication was filed on October 21, 1994, and an amended motion, including various new attachments, was filed on October 28, 1994. The memorandum in support of the director's motion alleged that the order was necessary because Kotis's mental condition rendered him dangerous to himself and others.

A hearing was held on the director's motion on December 29 and 30, 1994. At the hearing, the director's expert witness, Toshiyuki Shibata, M.D., who was qualified in the fields of medicine and psychiatry, testified that he had interviewed Kotis approximately seven times over a period of two and one-half to three months, in sessions ranging in length from ten to forty minutes. Dr. Shibata testified that he had diagnosed Kotis as suffering from "schizoaffective disorder," a condition manifested in Kotis by anger, paranoid delusions, and extreme mood swings. He testified that he had recommended that Kotis be placed on a course of antipsychotic and other medications, outlined in Director's Exhibits 3 and 4,[8] which he believed to be

---

7. In his opening brief, Kotis describes at length the parties' dispute over whether he should have been housed at the Oʻahu Community Correctional Center (OCCC), as requested by the prosecution, or at the State Hospital, as requested by Kotis. As Kotis's opening brief itself notes, however, Kotis has been housed continuously at the State Hospital since December 1996. Accordingly, that issue is moot. Moreover, the location of Kotis's confinement has nothing to do with the question whether it was permissible to medicate Kotis involuntarily, which is the sole issue on appeal. Therefore, we do not address the issue of the location of Kotis's confinement.

8. Director's Exhibit 3 was a document entitled "Department of Health Psychiatric Medication Report October 18, 1994," which was introduced

into evidence. The report contained a list of proposed medications and the "target symptoms," side effects, and risks associated with them. The report stated that, "[a]lthough this list contains many medications, it is likely that Mr. Kotis would only receive about two or three concurrently" and that only some of those listed could be involuntarily administered as injections. The report listed, *inter alia*, antipsychotic medications, such as lithium, Thorazine, Mellaril, Prolixin, Haldol, Riperdal, and Clozaril, "beta-blockers," prescribed "for the treatment of akathisia (restlessness) caused by antipsychotic medication," "anti-anxiety, agitation, and sleep medication," and other types of medications. With regard to the antipsychotic medications, the report recited side effects, including "[b]lurry vi-

"medically appropriate" because Kotis's "delusional belief status prevents him from becoming fit in court" and "the medications would stabilize his mood and potentially decrease his dangerousness."

With regard to Kotis's dangerousness to others, Dr. Shibata testified that Kotis's medical reports from the Oʻahu Community Correctional Center (OCCC) indicated that "he ha[d] made threatening remarks to his attending physician," but that he had not threatened or accosted anyone else at OCCC. When asked his opinion "as to whether the defendant ... present[s] a danger to others," Dr. Shibata responded that he "believe[d] that [Kotis] *may* pose a *possible* danger to others." (Emphases added.) In this connection, Dr. Shibata opined that "[t]here's no empirical way of measuring or predicting future dangerousness," but noted that he had taken into account the fact that Kotis had been charged with kidnapping, as well as "the fact that he showed *mood instabilities*, display[ed] lots of anger, ... past substance abuse history, [and] his delusional belief status where he feels threatened by quite a few people." Nevertheless, although Dr. Shibata believed that his proposed treatment would diminish Kotis's dangerousness, he testified that he "couldn't say for a certainty, whether it would be essential" to that objective.

With regard to Kotis's dangerousness to himself, Dr. Shibata testified that he did not believe that Kotis was "imminently suicidal," but noted that "there is always the *possibility* [,] knowing Mr. Kotis'[s] labile mood, which could swing from agitation to depression." (Emphasis added.) He added that Kotis "has made statements about thoughts of dying, thoughts of committing suicide.

He has made several statements about possibly hanging himself, getting the police to shoot him[.]" Dr. Shibata testified that the medications that he had proposed were "standard" for addressing the risk of suicide, inasmuch as they "decrease the mood swings ..., making the person more stable emotionally, which would greatly reduce the possibility of suicide." He also noted that "[s]cientific reports indicate that[,] without treatment[,] people [who] ... suffer from mood swings[,] up to 15 per cent will complete the suicide and that number is greatly reduced with the use of medication."

Dr. Shibata also testified that he had considered two "other modalities of treatment" in Kotis's case: psychotherapy and behavior modification. Based on the medical reports from OCCC, Dr. Shibata concluded that these modalities had been useful "[a]t times ... in getting Mr. Kotis to calm down[,] but they are very limited in their effectiveness."

Additional testimony was given by Keith Brown, M.D., the attending psychiatrist at OCCC, who had treated Kotis since September 1992 and had seen him approximately eighty times. Dr. Brown testified that he did not believe Kotis to be dangerous to himself or to others and that medication would not be effective in treating him.

After the parties had concluded their examination of Dr. Brown, the circuit court asked him several clarifying questions regarding his testimony. During this questioning, the circuit court made reference to judicial notice:

> THE COURT: Doctor, have you seen the reports—and I know these reports are pretty old now, but the original reports of

---

sion, [c]onstipation, [l]ess sweating, [d]izziness, [d]ry mouth, [s]hakiness, [s]tiffness, [m]uscle spasms, [n]asal stuffiness, [f]ast heartbeat, [d]rowsiness, [s]kin rash, [and] [w]eight gain," and described "risks," including "[i]rreversible movement problems, [n]euroleptic malignant syndrome: ([r]are but can be fatal, [s]evere stiffness, [f]ever, [m]uscle problems, [k]idney problems), [l]iver problems ([j]aundice), [l]ow blood count: ([s]ore throat, [f]ever, [s]ores in the mouth or skin, [u]nusual bleeding or bruising, [and] [w]eakness)[.]" Additionally, the report specified that side effects might include akathisia and tardive dyskinesia, defined as an "irreversible movement problem" that "can be disfiguring if severe" but that is "usually mild in most cases."

Director's Exhibit 4 was a document entitled "Addendum to Psychiatric Medication Report October 24, 1994," signed by R. Andrew Schultz–Ross, M.D., a staff psychiatrist at the Hawaiʻi State Hospital. The addendum recommended that "a judicial order authorizing treatment (and blood levels) not be specific to agents or classes, and therefore allow medical judgment to change treatment based on response." Dr. Schultz–Ross recommended that certain medications from the list in Exhibit 3 be administered by injection "[d]uring active refusal" and that others be taken orally "[a]fter active refusal."

Dr. Adams, Dr. Bianchi and Dr. Gidder with respect to the defendant's fitness and their respective diagnos[e]s?

THE WITNESS: I talked to a Dr. Gidder....

....

THE COURT: And did you agree or disagree with his diagnosis and findings?

THE WITNESS: I disagreed with it.

THE COURT: You disagreed with them.

....

THE COURT: So if the other two doctors on this panel had findings and diagnos[e]s consistent with Dr. Gidder's[,] you would disagree with their findings and diagnos[e]s as well, is that right?

THE WITNESS: Yes.

THE COURT: Let me ask you this, Doctor.... I'm having to make a decision based on the information before me and— *before I forget, the Court does take judicial notice of the records and files in this case*—well, obviously in having to make this decision[,] I have to weigh ... your respective opinions of what is before me.

Now, if this situation is such that you represent a minority position, what is it about your position that you feel is more credible than the other positions?

(Emphasis added.) Kotis's counsel did not object to the circuit court's statement regarding judicial notice. The records on file in the case at that point included affidavits, reports, and letters of other psychiatrists and psychologists who had examined Kotis during the course of his detention. Drs. Brown and Shibata were the only witnesses at the hearing.

During the oral arguments regarding the director's motion, the deputy prosecuting attorney urged that involuntary medication was necessary to render Kotis competent to stand trial. As in his written motion, however, counsel for the director argued only that the order was necessary by virtue of Kotis's dangerousness. The circuit court took the matter under advisement without oral comment.

On February 16, 1995, the circuit court filed its written order. The order recited that the circuit court had arrived at its FOFS and conclusions of law (COLs), "having considered the evidence presented at the hearing on this motion, having taken judicial notice of the records and files herein, having taken judicial notice of the report of the Guardian ad Litem, having heard the arguments of counsel, and being fully apprised of the issues[.]" The circuit court's "findings" were as follows:

1 Pursuant to sections 551-2 and/or 346-234, Hawaii Revised Statutes, the Guardian Ad Litem was properly and legally appointed by the Court;

2 The Court has jurisdiction over this case;[ 9]

3 The Defendant William Kotis poses a danger to himself in that he has had suicidal ideation and incidents of head banging;

4 The Defendant poses a threat to others in that he suffers from frequent and severe mood swings, delusional beliefs of being threatened by others, and substance abuse;

5 Based on Dr. Shibata's testimony, Dr. Patel's report, the reports and findings of the sanity panel, and Judge Acoba's prior findings, the Court concludes that

9. We agree with the circuit court that it appropriately exercised jurisdiction over the director's motion, as a matter arising out of the circuit court's commitment of Kotis to the director's custody, pursuant to HRS § 704-406.

> [T]he circuit courts in this state are courts of general jurisdiction. *State v. Villados,* 55 Haw. 394, 520 P.2d 427 (1974). As such, "jurisdiction extends to all matters properly brought before them, unless precluded by constitution or statute." *In re Chow,* 3 Haw.App. 577, 656 P.2d 105, 109 (1982) (citing *In re Keamo,* 3 Haw.App. 360, 650 P.2d 1365 (1982)).

*State v. Medeiros,* 89 Hawai'i 361, 365 n. 4, 973 P.2d 736, 740 n. 4 (1999) (quoting *State v. Dwyer,* 78 Hawai'i 367, 370, 893 P.2d 795, 798 (1995)). *See also* HRS § 603-21.9 (1993) (providing in relevant part that "[t]he several circuit courts shall have power ... [t]o make and award such ... orders ... and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given them by law or for the promotion of justice in matters pending before them").

Defendant suffers from a mental disease, disorder, or defect;

6 The involuntary medication treatment plan for the Defendant ... is medically appropriate because of Defendant's mental disease, disorder, or defect as diagnosed and confirmed by Toshiyuki Shibata, M.D., and Vit U. Patel, M.D., in their respective written reports and testimony;

7 Under the circumstances, involuntary medication is essential for Defendant's benefit and for the benefit of others since no other less intrusive treatment is available;

8 As testified to by Dr. Shibata, Defendant's condition will not improve without medication since alternative treatments such as psychotherapy and behavior modification have been inadequate;

9 The Court finds Dr. Brown's testimony not credible.

Accordingly, the director's motion for an order authorizing the administration of involuntary medication was granted. Kotis filed a timely notice of appeal and requested a stay of the order pending the appeal. The stay was denied.

## II. *STANDARDS OF REVIEW*

### A. *Interpretation Of A Statute*

 "[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). *Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84

Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists ....
>
> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Dudoit,* 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker,* 90 Hawai'i 85, 90–91, 976 P.2d 399, 404–05 (1999)) (quoting *Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998))).

### B. Questions Of Constitutional Law

■ ... We answer questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Trainor*, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citation and internal quotation marks omitted); *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996) (citations, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995), and *State v. Gaylord*, 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995); *State v. Baranco*, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional rights against double jeopardy would be violated unless indictment dismissed is a question of law, reviewed under right/wrong standard); *In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution as applied to the states through fourteenth amendment and by article I, section 4 of Hawai'i Constitution are questions of law freely reviewable on appeal).

*State v. Quitog*, 85 Hawai'i 128, 139, 938 P.2d 559, 570 (1997) (quoting *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

### C. Findings Of Fact

■ "A[n] [FOF] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Investments Co.*, 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (quoting *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994))). An FOF is also clearly erroneous when "the record lacks substantial evidence to support the finding." *Alejado v. City and County of Honolulu*, 89 Hawai'i 221, 225, 971 P.2d 310, 314 (App.1998) (quoting *Nishitani v. Baker*, 82 Hawai'i 281, 287, 921 P.2d 1182, 1188 (App.1996)). *See also State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Roxas v. Marcos*, 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting *Kawamata Farms v. United Agri Products*, 86 Hawai'i 214, 253, 948 P.2d 1055, 1094 (1997) (quoting *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation, some internal quotation marks, and original brackets omitted))).[10]

### D. Judicial Notice Of Records And Files

■ A trial court's *sua sponte* decision to take judicial notice of an adjudicative

---

10. Kotis suggests that, because of the importance of the issues involved in the present case, this court should extend its *de novo* review to the circuit court's *factual* findings as well as to its legal conclusions. In support, he cites, *inter alia*, to this court's decisions in *Trainor*, 83 Hawai'i at 255, 925 P.2d at 832, *State v. Navas*, 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996), *State v. Baranco*, 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994), *State v. Hoey*, 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994), and *State v. Kelekolio*, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993). We agree that the *ultimate issue* at stake in this case—whether the state's interests in a particular case outweigh the defendant's liberty interest in being free from unwanted medication—is a question of constitutional law and is therefore subject to *de novo* review. *See supra* section II.B. However, the circuit court's findings with regard to the *underlying facts* relevant to the foregoing determination are subject to the clearly erroneous standard. *Cf. Trainor*, 83 Hawai'i at 255, 925 P.2d at 823 (making the distinction that the assessment of the "ultimate issue" of consent to a seizure is reviewable *de novo*, whereas the underlying factual issues, *i.e.*, "(1) whether the person was timely advised that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) whether, thereafter, the person voluntarily participated in the encounter," are reviewable under the clearly erroneous standard); *Hoey*, 77 Hawai'i at 32, 881 P.2d at 519 (noting that the circuit court's FOFs relevant to the issue of the voluntariness of a confession are reviewed under the clearly erroneous standard, but that the circuit court's "application of constitutional principles to the facts as found" is reviewed *de novo* ); *Kelekolio*, 74 Haw. at 502, 849 P.2d at 69 (determining that the *de novo* standard applies to the "ultimate issue of voluntariness" of a suspect's statement to the police).

fact constitutes an exercise of its discretion. *See* Hawai'i Rules of Evidence (HRE) Rule 201(c) (1993) (providing in relevant part that "[a] court may take judicial notice, whether requested or not"). " 'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.' " *Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 351, 944 P.2d 1279, 1294 (1997) (quoting *Arceo*, 84 Hawai'i at 11, 928 P.2d at 853 (quoting *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996))).

### E. *Plain Error*

 "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (citations and internal quotation signals omitted). *See also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

*State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (quoting *State v. Davia*, 87 Hawai'i 249, 253, 953 P.2d 1347, 1351 (1998)).

### III. *DISCUSSION*

#### A. *The Circuit Court Possessed The Authority To Issue The Order Permitting The Administration Of Involuntary Medication.*

[13] Kotis argues that there was neither statutory nor any other authority for the circuit court's order permitting the director to medicate him involuntarily. We disagree.

HRS § 704–406 expressly provides that, upon a determination that a criminal defendant is unfit to proceed, "the court shall commit the defendant to the custody of the director of health to be placed in an appro-

priate institution for *detention, care, and treatment.*" (Emphasis added.) Both the plain language of HRS § 704–406 and its legislative history are silent as to whether "detention, care, and treatment" may include a court order authorizing the involuntary administration of antipsychotic drugs. Common sense, and an analysis of other statutes *in pari materia*, however, demonstrate that such an order *is* included within the authority vested by HRS § 704–406.

HRS § 334–34 (1993) provides in relevant part that "[t]he director of health shall be responsible for the safekeeping of all patients who may be admitted to the state hospital and for the enforcement of proper order among and concerning the patients." The director's motion in this case alleged that it was necessary to medicate Kotis involuntarily because of the danger he posed to himself and to others in the hospital. Thus, the circuit court's order appears to be justified by the director's statutory responsibility for Kotis's "safekeeping" and for the maintenance of "proper order among and concerning the patients."

 Kotis argued in the circuit court that his informed consent was required before being administered any medication pursuant to HRS § 334E–1 (1993), which provides in relevant part that,

> [b]efore any nonemergency treatment for medical illness can commence, *informed consent,* as required by section 671–3[ [11] ] and as defined by the board of medical examiners pursuant to the authority vested in it by that section, *shall be obtained from the patient, or the patient's guardian, if the patient is not competent to give informed consent.*

(Emphases added.) As Kotis points out, the circuit court did not make any express finding regarding Kotis's competence to give informed consent to his treatment.[12] More-

---

**11.** HRS § 671–3(a) (1993) provides in relevant part:

> The board of medical examiners, insofar as practicable, shall establish standards for health care providers to follow in giving information to a patient, or to a patient's guardian if the patient is not competent to give an informed

consent, to ensure that the patient's consent to treatment is an informed consent. . . .

**12.** The director does not argue, and we do not believe, that the circuit court's finding that Kotis was unfit to proceed to trial—*i.e.*, that "as a result of physical or mental disease, disorder, or defect, [Kotis] lack[ed] capacity to understand

over, although a GAL was appointed in this case, the circuit court did *not* appoint a guardian of Kotis's person.[13] Arguably, therefore, the circuit court failed to comply with HRS § 334E–1 because it failed to obtain Kotis's "informed consent."

However, HRS § 334E–2 (1993), which contains a lengthy list of the rights accorded to "[a]ny patient in a psychiatric facility" to be exercised either by the patient or by "the patient's legal guardian or legal representative," provides in subsection (a)(9) for a right of "[r]efusal of treatment *except* in emergency situations or *where a court order exists* [.]" (Emphases added.) Accordingly, by its express terms, HRS § 334E–2(a)(9) contemplates a situation, such as the one at bar, in which the circuit court may be called upon to authorize *involuntary* treatment of the patient, *i.e.*, where neither the patient nor his or her guardian consents to the treatment, even absent an emergency. *See also* Hawai'i Administrative Rules (HAR) § 11–175–33(a) (1988) (providing in relevant part that

the proceedings against [him] or to assist in [his] own defense," *see* HRS § 704–403 (1993)—may reasonably be construed as a simultaneous finding that Kotis was incompetent to decide to refuse nonemergency medications.

13. A guardian ad litem does not possess the same general powers and responsibilities as a guardian of the person. "A *guardian ad litem* is a special guardian appointed by the court in which a particular litigation is pending to represent an infant, ward, or unborn person in that particular litigation, and the status of guardian ad litem exits only in that specific litigation in which the appointment occurs." *Black's Law Dictionary* 706 (6th ed.1990) (emphasis in original). "A *general* guardian is one who has the general care and control of the person and estate of a ward; while a *special* guardian is one who has special or limited powers and duties with respect to a ward, *e.g.*, a guardian who has the custody of the estate but not of the person, or vice versa, or a guardian *ad litem.*" *Id.* (emphases in original). *See also* HRS §§ 334–60.5(c) and (j) (Supp.1998) (distinguishing between the appointment of a guardian ad litem "to represent the subject [of a petition for involuntary hospitalization] throughout the proceedings" and a "guardian of the person, or property, or both"), 554B–1 (1993) (defining, for purposes of the Uniform Custodial Trust Act, the term "guardian" as "a person appointed or qualified by a court as a guardian of an individual and includ[ing] a limited guardian, *but exclud[ing] a person who is merely a guardian ad litem*" (emphasis added)); 560:1–201(17), (18), and (19) (1993) (providing separate

"[m]ental health ... programs shall obtain informed consent to treatment ... *except for a person specifically ordered by a court to be involuntarily treated*" (emphasis added)).

■ "[W]here there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." *State v. Vallesteros*, 84 Hawai'i 295, 303, 933 P.2d 632, 640, *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997) (citations and internal quotation signals omitted). Reading HRS §§ 334E–1 and 334E–2(a)(9) *in pari materia*, therefore, it is apparent that HRS § 334E–2 carves an exception to the general rule, as set forth in HRS § 334E–1, that the patient or his or her guardian must consent to a particular course of treatment.[14] Furthermore, construing HRS § 704–406 in light of HRS § 334E–2, it

definitions for the terms "guardian ad litem," "guardian of the person," and "guardian of the property" for purposes of the Uniform Probate Code); 560:3–203(d) (Supp.1998) (providing in relevant part that "any guardian *except a guardian ad litem* of a minor or incapacitated person[ ] may exercise the same right[s]" as the ward with respect to nomination proceedings for a personal representative of a decedent (emphasis added)). Whereas a guardian ad litem is only empowered to represent an incapacitated person's interests in particular litigation, a "guardian of the person" "has the same powers, rights and duties respecting the guardian's ward that a parent has respecting the parent's unemancipated child," including the power to "give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service." HRS § 560:5–312(a) (1993).

14. Moreover, we note that, in Part VIII of HRS ch. 334, the legislature has established procedures for the imposition of involuntary *outpatient* treatment upon certain mentally ill persons who are, *inter alia*, "capable of surviving safely in the community with available supervision from family, friends, or others." *See* HRS § 334–121(2) (1993). Such outpatient treatment may include "medication specifically authorized by court order." HRS § 334–122 (1993). It would defy logic for the legislature to allow for involuntary medication of a patient on an outpatient basis, but to disallow such treatment of a patient who must be detained in a psychiatric facility.

appears that the former statute's allowance for "detention, care, and treatment" of a pretrial detainee may legitimately include seeking court approval for involuntary medication.

The Department of Health appears to have arrived at the same conclusion, as demonstrated by HAR § 11–175–45 (1988), the rule promulgated to enforce HRS § 334E–2. That rule provides in relevant part:

> *Right to refuse nonemergency treatment.*
>
> (a) Psychiatric facilities and residential treatment facilities shall establish policies and procedures for exercise of the right to refuse nonemergency treatment by consumers, *except consumers ordered by a court to receive specific treatment.* ...
>
> . . . .
>
> (b) When informed consent to proposed treatment is not obtained, the facility shall:
>
> . . .
>
> (2) Petition for a guardian for the consumer if the consumer has been clinically determined not to have the capacity to make a decision regarding treatment and the consumer does not have a guardian or attorney-in fact, and obtain consent from the guardian or attorney-in-fact before nonemergency treatment begins;[15] or
>
> (3) *Obtain a specific court order for involuntary treatment if the consumer appears to have the capacity to make a decision regarding treatment and has been ordered by a court to be involuntarily hospitalized.*

(Emphases added.)

■ Because Kotis was involuntarily hospitalized by order of the circuit court, HAR § 11–175–45(b)(3) applies to his case and authorizes the director's motion for an order of involuntary medication. Administrative rules, like statutes, have the force and effect of law. *State v. Kirn,* 70 Haw. 206, 208, 767 P.2d 1238, 1239–40 (1989) (citing *Abramson v. Board of Regents, University of Hawaii,* 56 Haw. 680, 548 P.2d 253 (1976), and *Aguiar v. Hawaii Hous. Auth.,* 55 Haw. 478, 522 P.2d 1255 (1974)); *Baldeviso v. Thompson,* 54 Haw. 125, 129, 504 P.2d 1217, 1221 (1972) (citing *State v. Kimball,* 54 Haw. 83, 503 P.2d 176 (1972)). Kotis has not alleged any infirmity in the promulgation of HAR § 11–175–45(b)(3). Accordingly, inasmuch as we discern no conflict between HRS § 11–175–45(b)(3) and the governing statutes, Kotis's argument that the circuit court acted without authority fails.

B. *The State's Interest In Preventing A Defendant From Harming Himself Or Herself Or Others May Override The Defendant's Liberty Interest In Bodily Integrity And The Right, As A Matter Of Substantive Due Process, To Have His Or Her Mental Functions Unimpeded While Preparing For Trial.*[16]

■ Kotis next asserts that a trial court may never constitutionally authorize the administration of involuntary antipsychotic medication of a criminal defendant prior to, or during, trial.[17] In support, he cites

---

**15.** Inasmuch as a guardian of the person, *see supra* note 13, was never appointed in this case, this court is not called upon to examine the ramifications of *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), *see infra* section III.B, with respect to the application of HAR § 11–175–45(b)(2).

**16.** Kotis has not placed at issue his right to privacy, pursuant to article I, section 6 of the Hawai'i Constitution (1978), in the present matter, and we therefore do not address it.

**17.** The director argues in his answering brief that Kotis "waived his ability to challenge a violation of his rights under the Constitution of

the United States." The director bases his argument on the following language appearing in a declaration of Kotis's counsel, attached to a motion for extension of time to file his opening brief:

> ... At all times subsequent to 1 November 1996 [when the declarant counsel was appointed], Appellant KOTIS has been unable to assist your Declarant in any manner, pursuant to the standards and criteria set forth in Dusky v. United States, 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960)[,] and Drope v. Missouri, 420 U.S. 162, 171 [95 S.Ct. 896, 43 L.Ed.2d 103] (1975)[.]
>
> ...

the United States Supreme Court's decisions in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).

In *Harper*, the Supreme Court addressed the question whether the State of Washington had violated the right of a prison inmate to due process of law by forcibly administering antipsychotic drugs to him. 494 U.S. at 213, 110 S.Ct. 1028. The *Harper* Court recognized that the degree of the state's proposed intrusion on the prisoner's bodily integrity was substantial:

> The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Cf. Winston v. Lee*, 470 U.S. 753 [105 S.Ct. 1611, 84 L.Ed.2d 662] (1985); *Schmerber v. California*, 384 U.S. 757, 772 [86 S.Ct. 1826, 16 L.Ed.2d 908] (1966). The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect ... is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes.... [I]t may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akath[i]sia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); tardive dys-

kinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.... [T]he evidence ... suggests that the proportion of patients treated with antipsychotic drugs who experience the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe.

*Id.* at 229–30, 110 S.Ct. 1028 (some citations omitted).

However, while recognizing that an inmate retains some constitutional rights, the *Harper* Court noted that the extent of those rights must be defined within the context of the inmate's confinement as a convicted person. *Id.* at 222–23, 110 S.Ct. 1028. Having balanced the inmate's liberty interest against the prison administrator's (1) "obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution," (2) "interest in ensuring the safety of prison staffs and administrative personnel," and (3) "duty to take reasonable measures for the prisoners' own safety," the *Harper* Court concluded that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's

---

... Your Declarant, mindful of the decisions of the United States Supreme Court in *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 ... (1992)[,] and *Cooper v. Oklahoma*, [517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (holding that a state may not require a defendant to prove incompetency by clear and convincing evidence) ], does not believe that the record in this case allows him to presently claim, consistently with the requirements of Rule 3.1 of the Hawai'i Rules of Professional Conduct, that Appellant KOTIS' rights under the Constitution of the United States were violated by the proceedings conducted below, *but your Declarant cannot adequately discus[s] the factual issues with KOTIS due to his unfitness to proceed.*

(Emphases added.) Assuming, *arguendo*, that it is possible for a criminal defendant's appointed appellate counsel to waive the client's points of error on appeal through a declaration associated with a *procedural* motion filed with this court, no such waiver could have occurred here. Kotis's counsel made clear in his declaration that his doubt regarding the constitutional arguments depended not only upon his understanding of the United States Supreme Court's decisions in *Riggins* and *Cooper*, but also upon his inability to "discus[s] the factual issues" with his client. We may assume that counsel was subsequently able to ascertain the facts he felt necessary to support the constitutional arguments presented herein subsequent to his motion. Accordingly, we reject the director's argument.

medical interest." *Id.* at 225, 227, 110 S.Ct. 1028.

In *Riggins,* a criminal defendant moved for an order suspending the administration of antipsychotic drugs until the end of his trial. 504 U.S. at 130, 112 S.Ct. 1810. Riggins claimed that the effects of the medications on his demeanor and mental state during trial would deny him due process and that, because he planned to offer an insanity defense, continued treatment would prevent jurors from observing his "true mental state." *Id.* The Nevada trial court denied the motion, and Riggins was tried and convicted of murder and sentenced to death. *Id.* at 131, 112 S.Ct. 1810.

On appeal following the conviction, the United States Supreme Court noted that, "[u]nder *Harper,* forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial." *Riggins,* 504 U.S. at 135, 112 S.Ct. 1810 (citation omitted). Accordingly, the *Riggins* Court held that the forced administration of antipsychotic drugs during Riggins's trial had violated his constitutional rights under the sixth and fourteenth amendments, because the trial court had not found that "administration of antipsychotic medication was necessary to accomplish an essential state policy." *Id.* at 138, 112 S.Ct. 1810. However, the *Riggins* Court declined to "prescribe substantive standards" for the involuntary administration of antipsychotic drugs because the trial court had allowed the administration "without making *any* determination of the need for this course or *any* findings about reasonable alternatives.... Nor did the order indicate a finding that safety considerations or other compelling concerns outweighed Riggins'[s] interest in freedom from unwanted antipsychotic drugs." *Id.* at 136, 112 S.Ct. 1810 (emphases in original).

On the other hand, the *Riggins* Court noted that "Nevada certainly would have satisfied due process if the prosecution had demonstrated ... that treatment with antipsychotic medication was medically appro-priate and, considering less intrusive alternatives, essential for the sake of Riggins'[s] own safety or the safety of others." *Id.* at 135, 112 S.Ct. 1810 (citing *Harper,* 494 U.S. at 225–26, 110 S.Ct. 1028, and *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). The *Riggins* Court also stated that Nevada *"might* have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins'[s] guilt or innocence by using less intrusive means." *Id.* (emphasis added) (citation omitted).

We agree with Kotis that, although *Riggins* hinted that it "might" be permissible for a trial court to order the involuntary treatment of a defendant with antipsychotic drugs in order to render him fit to stand trial, it left that issue essentially unsettled. In any event, this court is *not* faced with that issue in the present appeal. Although the prosecution argued the need to render Kotis fit to stand trial during the hearing on the director's motion, the director invoked only the need to forestall the danger Kotis allegedly posed to himself and others. In its order granting the director's motion, the circuit court also relied solely upon that alleged danger and made no mention of the need to try Kotis on the charges against him. Thus, the sole issue before this court is whether, on the record before us, it was permissible for the circuit court to authorize involuntary medication to ameliorate the purported danger that Kotis posed to himself and others.

In light of the narrow issue presented, Kotis's reliance upon *Harper* and *Riggins* for the extreme proposition that a pretrial detainee may *never* be forcibly medicated is therefore misplaced. As discussed *supra, Harper* concerned convicted prisoners and affirmed that it was *possible* for the state's penological interests to override an inmate's liberty interests with respect to involuntary medication. *Riggins* suggested that, although a criminal defendant, like any other mental health patient, possesses a fundamental right to refuse treatment threatening his bodily integrity, that right may be overridden by the state's interest in preventing him or her from causing physical harm to

self or others. Similarly, although the *Riggins* Court recognized that involuntary administration of antipsychotic medication might have a prejudicial impact on a defendant's ability to prepare and assist in his own defense, "trial prejudice can sometimes be justified by an essential state interest." *Riggins,* 504 U.S. at 138, 112 S.Ct. 1810 (citations omitted).

 In sum, we read *Riggins* to require the following three findings before a criminal defendant may constitutionally be involuntarily medicated with antipsychotic drugs, where it is alleged that the medication is necessary because the defendant poses a danger to himself or herself or others: (1) that the defendant actually poses a danger of physical harm to himself or herself or others; (2) that treatment with antipsychotic medication is medically appropriate, that is, in the defendant's medical interest; and (3) that, considering less intrusive alternatives, the treatment is essential to forestall the danger posed by the defendant. *Cf. State v. Odiaga,* 125 Idaho 384, 871 P.2d 801, 804 (1994) (construing *Riggins* to hold that "the burden rests with the prosecution to show that medication is medically appropriate, essential to protect some significant interest, such as [the defendant's] safety or the safety of others, and that no less obtrusive means of protecting that interest exists"), *cert. denied,* 513 U.S. 952, 115 S.Ct. 369, 130 L.Ed.2d 321 (1994); *Harrison v. State,* 635 So.2d 894, 905 (Miss.1994) (construing *Riggins* to hold that "involuntary treatment of the criminally accused with antipsychotic medication is permissible only where medically appropriate and, considering less intrusive alternatives, essential for safeguarding a compelling state interest").[18]

**18.** We note that the majority in *Riggins* rejected the dissent's characterization of its approach as "strict scrutiny" review of the state's decision involuntarily to medicate the defendant, claiming instead that it "ha[d] no occasion to finally prescribe such substantive standards . . ., since the District Court allowed administration of Mellaril to continue without making *any* determination of the need for this course or *any* findings about reasonable alternatives." 504 U.S. at 136, 112 S.Ct. 1810 (emphases in original). Having been left to fend for themselves as to this element of the analysis, the federal courts have split on the question whether "rational basis" or "strict scrutiny" review should apply to the task. *Compare United States v. Brandon,* 158 F.3d 947, 956–58 (6th Cir.1998) (holding strict scrutiny applies because the defendant's right to be free from involuntary medication is a fundamental right), *and Woodland v. Angus,* 820 F.Supp. 1497, 1509–10 (D.Utah 1993) (same), *with Hightower ex rel. Dehler v. Olmstead,* 959 F.Supp. 1549, 1561 (N.D.Ga. 1996) (holding that *Riggins* had "rejected strict scrutiny as the appropriate standard to review state limitations on this type of liberty interest"), *and Jurasek v. Payne,* 959 F.Supp. 1441, 1454 (D.Utah 1997) ("This court adopts the 'reasonably related' test rather than the 'compelling necessity' or 'strict scrutiny' tests . . . as the proper standard of review applicable to the policies and regulations . . . concerning involuntary medication of patients. . . .").
We agree with the *Riggins* dissent that the majority's hesitation to label its test "strict scrutiny" is curious in light of its language, *inter alia,* requiring the trial court to make findings whether "antipsychotic medication was *necessary* to accomplish an *essential* state policy," *Riggins,* 504 U.S. at 138, 112 S.Ct. 1810 (emphases added), and its observation that the trial court could

have comported with due process had it found, *inter alia,* that, "considering less intrusive alternatives," the involuntary medication was *"essential* for the sake of Riggins' own safety or the safety of others." *Id.* at 135, 112 S.Ct. 1810 (emphasis added). *See also id.* at 156–57, 112 S.Ct. 1810 (Thomas, J., dissenting). *Cf. Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 790–91, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (describing the "strict scrutiny" test as " '*necessary* to serve a *compelling* state interest and . . . narrowly drawn to achieve that end' ") (quoting *Perry Ed. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (emphases added)); *United States v. Lee,* 455 U.S. 252, 257–258, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) ("The state may justify a limitation on religious liberty by showing that it is *essential* to accomplish an *overriding* governmental interest." (Emphases added.)).
In any event, it appears to us that the three-part test articulated *supra,* which we adopt herein for purposes of article I, section 5 of the Hawai'i Constitution, *see infra,* expresses the full *substantive* due process analysis of a state's decision involuntarily to administer antipsychotic medication for the purpose of addressing the dangerousness of a patient. *But see infra* section III.C regarding the requisite burden of proof regarding the *Riggins* factors, as necessitated by the defendant's right to *procedural* due process. In other words, the *Riggins* test is *more specific* than, and a replacement for, the usual "necessary for an essential state interest" or "rationally related to a legitimate state interest" formulations associated with "strict scrutiny" and "rational basis" review. Accordingly, we regard the debate over which standard of review the *Riggins* test truly reflects to be academic.

Kotis suggests that, notwithstanding the implications of *Riggins* upon his *federal* constitutional rights, this court should hold, as a matter of *state* law, that the circuit court's order was unconstitutional. This court has repeatedly recognized that it may accord greater protection to criminal defendants under the Hawai'i Constitution than that conferred under the United States Constitution. *See, e.g., State v. Mendoza*, 82 Hawai'i 143, 146, 920 P.2d 357, 360 (1996) (citing *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996) (citing *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967))). Certainly, as Kotis suggests, his liberty interest in bodily integrity and his right to a fair trial are protected by article I, section 5 of the Hawai'i Constitution (1978) (providing in relevant part that "[n]o person shall be deprived of life, liberty, or property without due process of law ...").[19] However, Kotis offers no rationale justifying a departure from the *Riggins* due process analysis. Inasmuch as the *Riggins* test, as articulated above, succinctly and fairly directs the trial court's inquiry into the bases for the state's decision involuntary to medicate him for purposes of mitigating the harms associated with mental illness, we can discern no reason why the due process clause of the Hawai'i Constitution should require more.

In the present case, the circuit court expressly found (1) that "Kotis poses a danger to himself" and "to others," (2) that "[t]he involuntary medication treatment plan ... is medically appropriate," and (3) that, "[u]nder the circumstances, involuntary medication is essential for [Kotis's] benefit and for the benefit of others since no other less intrusive treatment is available[.]" Accordingly, we hold that the circuit court correctly applied the *Riggins* test in arriving at its ruling on the director's motion.

**C. Article I, Section 5 Of The Hawai'i Constitution Requires Clear And Convincing Evidence To Support The Circuit Courts' FOFs In Proceedings Concerning Involuntary Medication.**

Kotis argues that, even assuming that it is permissible in some circumstances involuntarily to administer antipsychotic medication to pretrial detainees, the requisite factual findings must be supported by clear and convincing evidence. The director counters that Kotis's position as an indicted defendant, detained as an inpatient in the director's custody, warrants a lower burden of proof. We agree with Kotis that his constitutional right to procedural due process mandates the burden of proof by clear and convincing evidence.

The seminal United States Supreme Court decision addressing the due process considerations relevant to the determination of the appropriate burden of proof is *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The *Addington* Court considered "what standard of proof [was] required by the Fourteenth Amendment to the Constitution in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital." 441 U.S. at 419, 99 S.Ct. 1804. In that connection, the United States Supreme Court observed that

[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the

19. As implied *supra* in note 16, Kotis's right to privacy, pursuant to article I, section 6 of the Hawai'i Constitution (providing in relevant part that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest"), is also implicated, inasmuch as that clause "gives each and every individual the right to control highly personal and intimate affairs of his own life."

*State v. Kam*, 69 Haw. 483, 492, 748 P.2d 372, 378 (1988) (quoting Stand. Comm. Rep. No. 69, in 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 674 (1980) (emphasis in original omitted)). However, despite citing article I, section 6 in his memorandum in opposition to the director's motion in the circuit court, Kotis has not invoked the right to privacy on appeal.

litigants and to indicate the relative importance attached to the ultimate decision.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that[,] historically[,] and without any explicit constitutional requirement[,] they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring[,] under the Due Process Clause[,] that the state prove the guilty of an accused beyond a reasonable doubt. *In re Winship, supra.*

*Id.* at 423–24, 99 S.Ct. 1804. Between the preponderance of the evidence and beyond a reasonable doubt standards, the *Addington* Court identified an "intermediate" standard, "which usually employs some combination of the words 'clear,' 'cogent,' 'unequivocal' and 'convincing[.]'" *Id.* at 424, 99 S.Ct. 1804. *See also Iddings v. Mee–Lee,* 82 Hawai'i 1,

13, 919 P.2d 263, 275 (1996) (" '[C]lear and convincing' evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is the degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." (Quoting *Masaki v. General Motors Corp.,* 71 Haw. 1, 15, 780 P.2d 566, 574 (1989) (citations omitted).)).

The *Addington* court noted that the standard of proof by clear and convincing evidence had been required "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant" because "[t]he interests at stake in those cases are deemed to be *more substantial than mere loss of money* ...." 441 U.S. at 424, 99 S.Ct. 1804 (emphasis added). Moreover, the Court observed that it had "used the 'clear, unequivocal and convincing' standard of proof to protect *particularly important individual interests* in various civil cases. See, *e.g., Woodby v. INS,* [385 U.S. 276,] 285 [87 S.Ct. 483, 17 L.Ed.2d 362 (1966)] (deportation); *Chaunt v. United States,* 364 U.S. 350, 353 [81 S.Ct. 147, 5 L.Ed.2d 120] (1960) (denaturalization); *Schneiderman v. United States,* 320 U.S. 118, 125, 159 [63 S.Ct. 1333, 87 L.Ed. 1796] (1943) (denaturalization)." *Id.* (emphasis added).[20] Acknowledging that "the ultimate

---

**20.** As this court noted in *Iddings,* in which it held that "claims based on wilful and wanton misconduct must be proven by clear and convincing evidence," this jurisdiction has also frequently imposed the burden of proof by clear and convincing evidence in "particularly important" civil proceedings:

Clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy.

So, in a number of cases where an adverse presumption is to be overcome, or on grounds of public policy and in view of the peculiar facilities for perpetrating injustice by fraud or perjury, the degree of proof required is expressed in such terms as "clear and convincing" and the phrase "preponderance of the evidence" has been expressly disapproved as an insufficient measure of the proof required. [*Masaki,* 71 Haw.] at 15–16, 780 P.2d at 575 (quoting *Travelers Indem. Co. v. Armstrong,* 442 N.E.2d 349, 360 (Ind.1982) (brackets and ellipsis points omitted)). In keeping with these principles, Hawai'i's appellate courts have implemented the clear and convincing standard of proof in a myriad of situations. *See, e.g., Carr v. Strode,* 79 Hawai'i 475, 904 P.2d 489 (1995) (proof to overcome presumption of paternity); *State v. Miller,* 79 Hawai'i 194, 900 P.2d 770 (1995) (proof to establish that criminal defendant is not a flight risk or danger to the community); *State v. Lopez,* 78 Hawai'i 433, 896 P.2d 889 (1995) (inevitable discovery rule); *Cresencia v. Kim,* 10 Haw.App. 461, 878 P.2d 725 (1994) (fraud); *Calleon v. Miyagi,* 76 Hawai'i 310, 876 P.2d 1278 (1994) (punitive

truth as to how the standards of proof affect decisionmaking may well be unknowable," the *Addington* Court nevertheless affirmed that "a standard of proof is more than an empty semantic exercise" and that, "[i]n cases involving individual rights, whether criminal or civil, [t]he standard of proof [at a minimum] reflects the value society places on individual liberty." *Id.* at 425, 99 S.Ct. 1804 (citations and internal quotation signals omitted) (some brackets added and some in original).

▮▮▮▮▮ With respect to the issue of civil commitment, the *Addington* Court noted that the United States Supreme Court "has repeatedly recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.* at 425, 99 S.Ct. 1804 (citations omitted). The *Addington* Court then weighed the potential harms to either side from an erroneous determination of the commitment question. In doing so, the *Addington* Court observed that "[t]he state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of the mentally ill." *Id.* at 426, 99 S.Ct. 1804. Nevertheless, the *Addington* Court determined that the person subject to an involuntary civil commitment proceeding faced the greater risk of harm because of the "significant deprivation of liberty" involved, the danger that such an individual might be committed for mere "idiosyncratic behavior," and the damaging effects of the "stigma" of being associated with severe mental illness."[21] *Id.*

---

damages); *Maria v. Freitas*, 73 Haw. 266, 832 P.2d 259 (1992) (constructive trust); *Office of Disciplinary Counsel v. Rapp*, 70 Haw. 539, 777 P.2d 710 (1989) (professional misconduct); *Chan v. Chan*, 7 Haw.App. 122, 748 P.2d 807 (1987) (civil contempt); *Mehau v. Gannett Pacific Corp.*, 66 Haw. 133, 658 P.2d 312 (1983) (defamation); *Woodruff v. Keale*, 64 Haw. 85, 637 P.2d 760 (1981) (termination of parental rights); *Tanuvasa v. City and County of Honolulu*, 2 Haw.App. 102, 626 P.2d 1175 (1981) (proof that government official acted with malice); *Boteilho v. Boteilho*, 58 Haw. 40, 564 P.2d 144 (1977) (oral contract for sale of real estate).
*Iddings*, 82 Hawai'i at 14, 919 P.2d at 276.

21. In *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), the United States Supreme Court distinguished *Addington* in the context of a commitment hearing conducted subsequent to an acquittal by reason of insanity. The *Jones* Court noted that the main concern in *Addington* had been that "members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.'" *Id.* at 367, 103 S.Ct. 3043 (quoting *Addington*, 441 U.S. at 426–27, 99 S.Ct. 1804). After an insanity acquittal, however, the *Jones* Court held that the foregoing concern was greatly diminished, inasmuch as, pursuant to the statute at issue in *Jones*, "automatic commitment ... follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness[.]" *Id.* (emphasis added). Accordingly, the *Jones* Court held that an insanity acquittee may constitutionally be committed based upon facts found by a preponderance of the evidence. *Id.* at 368.

This court came to a similar conclusion in *Thompson v. Yuen*, 63 Haw. 186, 623 P.2d 881 (1981), in the context of an equal protection challenge. In *Thompson*, we approved the following analysis:

The difference between [insanity acquittees and civil committees] for purposes of burden of proof, is in the extent of possibility and consequence of error. If there is error in a determination of mental illness that results in a civil commitment, a person may be deprived of liberty although he never posed any harm to society. If there is a similar error in confinement of an insanity-acquitted individual, there is not only the fact of harm already done, but the substantial prospect that the same error, ascribing the quality of mental disease to a less extreme deviance, resulted in a legal exculpation where there should have been legal responsibility for antisocial action.

63 Haw. at 189, 623 P.2d at 883 (quoting *United States v. Brown*, 478 F.2d 606, 611 (D.C.Cir. 1973)). *Cf. State v. Miller*, 84 Hawai'i 269, 275, 933 P.2d 606, 612 (rejecting a due process challenge to a statute placing the burden, by preponderance of the evidence, upon the defendant to demonstrate recovery sufficient to justify release from commitment after an acquittal by reason of insanity), *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997).

*Jones* and *Thompson* are distinguishable from the present case. Unlike an insanity acquittee, a defendant committed to the custody of the director because of unfitness need never voluntarily assert his own mental illness. *See* HRS § 704–404(1) (1993) (providing in relevant part that "[w]henever the defendant has filed a notice of intention to rely on the defense or mental

at 425–27, 99 S.Ct. 1804. The *Addington* Court therefore held that, on balance, "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Id.* at 427, 99 S.Ct. 1804.

Two distinct modes of analysis were thus employed simultaneously in *Addington*. *Addington* first referred to the burden of proof as a measure of "the value society places on individual liberty." In this regard, the *Addington* Court pointed out that the burden of proof by clear and convincing evidence has been invoked where "[t]he interests at stake ... are deemed to be more substantial than mere loss of money," *e.g.*, a tarnished reputation due to a fraud claim or the dislocation attendant upon deportation or denaturalization. Accordingly, the initial consideration pursuant to the *Addington* analysis is the importance of the liberty interest at stake. Second, the *Addington* Court employed a balancing test, weighing the potential harm to the state against the potential harm to the committed person in order fairly to distribute the risks of an erroneous decision.

Applying the two-pronged *Addington* analysis to the present case, we note at the outset that it is well established that an individual's interest in bodily integrity is of paramount social importance. *See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 849, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (noting that "the Constitution places limits on a State's right to interfere with a person's most basic decisions about ... bodily integrity,") (citing *Harper*, 494 U.S. at 221–222, 110 S.Ct. 1028; *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)); *State v. Miller*, 84 Hawai'i 269, 273, 933 P.2d 606, 610 ("Freedom from unjustified governmental intrusions into ... bodily autonomy [is] at the core of the liberty

protected by due process.") (Citing *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).), *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997). Similarly, a defendant's ability adequately to assist in his or her own defense in a criminal proceeding is a carefully protected and crucial interest. *See, e.g., State v. Soares*, 81 Hawai'i 332, 345–46, 916 P.2d 1233, 1246–47 (App.1996) (noting that "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial ...") (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (quoting *Riggins*, 504 U.S. at 139–40, 112 S.Ct. 1810 (Kennedy, J., concurring) (quoting *Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)))). Manifestly, society's interest in protecting a defendant from being improperly administered mind-altering drugs against his or her will is at least as great as its interests in protecting the reputations of persons sued for fraud and protecting individuals from wrongful deportations and denaturalizations. *Cf. Woodruff v. Keale*, 64 Haw. 85, 100–101, 637 P.2d 760, 770 (1981) (concluding, after examination of the *Addington* factors, that "[t]ermination [of parental rights] is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination of the parent-child relationship by proof more substantial than a preponderance of the evidence" (citation and internal quotation signals omitted)).

Moreover, applying the second prong of the *Addington* analysis, as Kotis argues, the risk of harm due to error faced by the individual subject to forcible antipsychotic medication is considerable, potentially involving fundamental changes in the nature of the individual's brain chemistry and thought processes, acute side effects, and associated risks as grave as death. *See Harper*, 494 U.S. at 229–30, 110 S.Ct. 1028. Indeed, the director's own treatment plan in this case

---

disease, disorder, or defect excluding responsibility, *or there is reason to doubt the defendant's fitness to proceed,* ... the court may immediately suspend all further proceedings in the prosecution" (emphasis added)). Moreover, as a pretrial detainee, such a defendant is presumed innocent

of the crimes with which he is charged, and no inappropriate exculpation has occurred. Thus, the rationales of *Jones* and *Thompson,* justifying reliance upon proof by a preponderance of the evidence, are inapposite to our analysis in the present case.

conceded the potential severity of the "risks" and "side effects" associated with the proposed medications.

On the other hand, the director points out that an erroneous determination that the defendant is *not* dangerous presents a significant risk of harm to hospital staff, other patients, and the defendant himself or herself. Relying on *Harper*, the director asserts that he not only has an interest, as *parens patriae*, in the safety of Kotis and other patients at the State Hospital who might be placed in danger by Kotis's violence, but that he also has an "obligation," as a "custodian," to protect that safety. *See Harper*, 494 U.S. at 225–26, 110 S.Ct. 1028; [22] *see also Lee v. Corregedore*, 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996) (noting that "one who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a ... duty [to take reasonable action to protect the other person from unreasonable risk of physical harm]") (quoting Restatement (Second) of Torts § 314A(4) (1965)) (brackets in original) (emphasis in original omitted).

The director fails to persuade us that the present case is distinguishable from *Addington*. In *Addington*, the trial court was charged by statute in the civil commitment proceeding to determine, *inter alia*, "whether [the proposed patient] require[d] hospitalization in a mental hospital *for his own* welfare and *protection or the protection of others* [.]" 441 U.S. at 420, 99 S.Ct. 1804 (emphases

added). In other words, the respondent's potential dangerousness was as much the focus of the trial court's inquiry in *Addington* as it is in the present case. Indisputably, as the *Addington* Court expressly recognized, the State of Texas had an important interest in protecting its citizens from the potential danger posed by a proposed patient living at large in the community and in preventing the proposed patient from harming himself. Nevertheless, *Addington* held that the importance of the liberty interests was such that proof by clear and convincing evidence was required to overcome them.

In the present case, the director has a *greater* opportunity to take palliative measures in the event of an erroneous decision than was available to the state in *Addington*. Where the state has failed to obtain an order committing an individual whom it believes to be dangerous, it has few options for controlling that individual. By contrast, where the director fails to obtain an order for involuntary medication of a *custodial* patient, he retains the power to restrain and monitor (*i.e.*, "detain" and "treat," *see* HRS § 704–406(1)) the patient by other, albeit perhaps not ideal, means.[23]

The additional element of a custodial "obligation" does not alter our analysis. The director's legal "obligation" to protect his staff and custodial patients can more accurately be described as a *duty* for purposes of tort law. *See Lee*, 83 Hawai'i at 159, 925 P.2d at 329. Where the director has acted with reasonable diligence in moving for a court order approving the involuntary admin-

---

22. We note that the language of *Harper*, upon which the director relies, arose in the context of the *Harper* Court's *substantive* constitutional balancing of the state's interests against the prisoner's interests. It was not directly related to the manner, *procedurally*, by which the factual findings that form the basis of that substantive balancing were established.

In a separate section of the opinion dealing with procedural due process, the *Harper* Court expressly rejected the prisoner's contention that the burden of proof by clear and convincing evidence was required in that case. However, the basis for its conclusion was the fact that, on the record before it, the determination regarding involuntary medication had been made, pursuant to prison policies, by medical professionals, rather than by a judge. *Harper*, 494 U.S. at 235, 110 S.Ct. 1028 (holding that "[the clear and convinc-

ing] standard is neither required nor helpful *when medical personnel are making the judgment* required by the regulations here" (emphasis added)). In the present case, no policy or rule has imparted to medical professionals the responsibility for the determination regarding the appropriateness of nonemergency forced medication of inpatients. Rather, as noted *supra* in section III.A, the determination is reserved to the circuit court, although the opinions of medical professionals may be available to the circuit court as evidence relevant to the parties' positions.

23. We note that we are not concerned in the present case with the director's options regarding involuntary medication under *emergency* circumstances.

istration of antipsychotic medications in appropriate circumstances, he obviously would not be subject to tort liability merely because the circuit court denied the motion for failure to meet the constitutionally mandated burden of proof. *Cf. Ruf v. Honolulu Police Department,* 89 Hawai'i 315, 327, 972 P.2d 1081, 1093 (1999) (holding that the imposition of a tort duty upon the police not to negligently release an arrestee would violate the public policy underlying article I, section 7 of the Hawai'i Constitution (1978) and the fourth amendment to the United States Constitution). Thus, the director's exposure to potential tort liability as a "custodian" adds little weight, for purposes of due process analysis, to the state's more general interest in protecting Kotis and other persons from Kotis's purported dangerousness.

Although we acknowledge that the risk of harm to the interests protected by the director is substantial, in light of the crucial interests at stake for Kotis and those similarly situated, we hold, on balance, that Kotis risks the greater harm. As the United States Supreme Court impliedly recognized in *Riggins,* the involuntary administration to a criminal defendant of antipsychotic medications by the state is so unique, with regard to the degree of intrusion into the most zealously guarded of a defendant's rights and liberty interests, that it must be approached with extreme caution, even in the custodial context. Moreover, in contrast to federal jurisprudence, this court has held, pursuant to the Hawai'i Constitution, that "the rights of persons not yet convicted of crimes must be more closely scrutinized than the rights of prisoners." *State v. Bayaoa,* 66 Haw. 21, 25 n. 2, 656 P.2d 1330, 1332 n. 2 (1982) (rejecting the United States Supreme Court's reasoning to the contrary, pursuant to the United States Constitution, in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) (citing *State v. Clark,* 65 Haw. 488, 498 n. 11, 654 P.2d 355, 362 n. 11 (1982)). *Cf. Riggins,* 504 U.S. at 157, 112 S.Ct. 1810 (Thomas, J., dissenting) (noting that "[t]he standards for forcibly medicating inmates may well differ from those for persons awaiting trial"). Thus, at least for purposes of article I, section 5 of the Hawai'i Constitution, we hold that due process requires that an order for the nonemergency involuntary administration of antipsychotic medications to a criminal defendant must be based upon facts found by clear and convincing evidence.

D. *Inasmuch As The Record Is Silent As To Which Burden Of Proof The Circuit Court Employed, This Court Should Presume That It Applied The Correct Burden Of Proof.*

■ The circuit court did not expressly indicate which burden of proof it applied to the evidence adduced in connection with the director's motion. Rather, it merely ruled that, "having considered the evidence," it "found" the facts described *supra* in section I. Accordingly, the record does not indicate whether the circuit court employed the burden of proof by "clear and convincing evidence," consistent with the imperatives of procedural due process. *See supra* section III.C.

Kotis had the opportunity to raise the issue of the appropriate burden of proof in the circuit court, but he did not do so. Inasmuch as he is the party alleging error, it was his burden to raise the issue, and any ambiguity in the circuit court's ruling may therefore be attributed to him. Where a trial court does not refer to the burden of proof, " 'a presumption arises that it applied the correct [burden].' " *Crosby v. State Department of Budget & Finance,* 76 Hawai'i 332, 342, 876 P.2d 1300, 1310 (1994) (quoting *State v. Aplaca,* 74 Haw. 54, 66, 837 P.2d 1298, 1305 (1992)), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995). The foregoing holds true even if the correct burden of proof has not yet been clarified by an appellate decision on the issue at the time of the trial court's determination. *See id.* at 342–43, 876 P.2d 1300 (presuming that the trial court applied the correct burden of proof in "whistleblower" case, despite the absence of Hawai'i case law on the issue). Accordingly, we presume that the circuit court applied the "clear and convincing" burden of proof.

E. *The Circuit Court Did Not Commit Plain Error In Taking Judicial Notice Of "The Records And Files In This Case."*

■ Kotis argues that the circuit court erred at the hearing on the director's motion

by taking judicial notice of "the records and files in this case." He complains that the circuit court thereby took notice of "hundreds of pages of documents containing hearsay, double hearsay[,] and triple hearsay," without providing adequate notice, either to Kotis or to this court for purposes of review on appeal, of the content of the evidence noticed. Because Kotis failed to object at trial, however, this court must examine the circuit court's ruling for plain error. *See* Hawai'i Rules of Evidence (HRE) Rule 103(a)(1) and (d) (1993).[24]

HRE Rule 201 (1993) provides in relevant part:

**Judicial notice of adjudicative facts.** (a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) When discretionary. A court may take judicial notice, whether requested or not.

. . . .

(e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.

██ This court has never directly considered whether a *trial court* may take judicial notice of the "records and files" in the case before it pursuant to HRE Rule 201, although it has indicated that a trial court may take judicial notice of "the pleadings, findings of fact and conclusions of law" filed in a separate court proceeding.[25] *See Fujii v. Osborne,* 67 Haw. 322, 329, 687 P.2d 1333, 1338–39 (1984) (citing *Lalakea v. Baker,* 43 Haw. 321 (1959); *McAulton v. Smart,* 54 Haw. 488, 510 P.2d 93 (1973)). *See also State v. Akana,* 68 Haw. 164, 165, 706 P.2d 1300, 1302 (1985) ("This court has validated the practice of taking judicial notice of a court's own records in an interrelated proceeding where the parties are the same." (Citing *State v. Wong,* 50 Haw. 42, 43, 430 P.2d 330, 332 (1967).)). As the director points out, a number of other jurisdictions have held that a trial court may take judicial notice of its own acts or of the existence of records on file in the same case. *See, e.g., Hatch v. Wagner,* 41 Colo.App. 35, 590 P.2d 973, 976 (1978) (approving of the trial court's decision to take judicial notice of a stipulation between the parties on record); *Perry v. Schaumann,* 110 Idaho 596, 716 P.2d 1368, 1371 (1986) (holding that it would have been appropriate for the trial court to take judicial notice of a stipulation between the parties filed with that court); *In re A.S.,* 12 Kan.App.2d 594, 752 P.2d 705, 709 (1988) (approving the trial court's decision to take judicial notice of the court file); *Riche v. Riche,* 784 P.2d 465, 468 (Utah Ct.App.1989) (noting that "[c]ourts

---

**24.** HRE Rule 103 provides in relevant part:

**Rulings on evidence.** (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(1) Objection. In the case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

. . . .

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting sub-

stantial rights although they were not brought to the attention of the court.

**25.** Similarly, this court has held that "an appellate court may[,] in its discretion, take judicial notice of files or records of a case on appeal." *Roxas v. Marcos,* 89 Hawai'i 91, 110 n. 9, 969 P.2d 1209, 1228 n. 9 (1998) (quoting *State v. Schmidt,* 70 Haw. 443, 446, 774 P.2d 242, 244 (1989) (citing *Eli v. State,* 63 Haw. 474, 478, 630 P.2d 113, 116 (1981), and HRE Rule 201)). *See also Brooks v. Minn,* 73 Haw. 566, 569 n. 2, 836 P.2d 1081 (1992) (taking judicial notice of a divorce decree in a family court proceeding for reference in a separate appeal involving an alleged breach of contract).

may take judicial notice of the records and prior proceedings in the same case" (citations omitted)); *State v. Blow,* 157 Vt. 513, 602 A.2d 552, 557 (1991) (approving the trial court's decision to take judicial notice of the date of the defendant's arraignment on two of the charges before it); *Fontana v. Fontana,* 426 So.2d 351, 355 (La.Ct.App.) (approving the trial court's decision to take judicial notice of its own judgment on record in the same case), *cert. denied,* 433 So.2d 150 (La. 1983).

However, as one court has expressed:

> A distinction must be carefully drawn between taking judicial notice of the *existence* of documents in the Court file as opposed to the *truth* of the facts asserted in those documents....
>
> ... [W]hile a Court may take judicial notice of each document in the Court's file[,] it may only take judicial notice of the truth of facts asserted in documents such as orders, judgments and findings of fact and conclusions of law because of the principles of collateral estoppel, res judicata, and the law of the case.
>
> .... *In re Snider Farms, Inc.,* 83 B.R. 977, 986 (N.D.Ind.1988). See[ ] also[ ] ... *M/V American Queen v. San Diego Marine Const.,* 708 F.2d 1483, 1491 (9th Cir. 1983) ("[a]s a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it"); *United States v. Am. Tel. & Tel. Co.,* 83 F.R.D. 323 (D.D.C. 1979) (judicial notice of court records should be limited to the fact of their existence rather than the truth of the matters contained in the court records)....

*Gottsch v. Bank of Stapleton,* 235 Neb. 816, 458 N.W.2d 443, 455–56 (1990) (emphasis in original omitted and emphases added) (some citations omitted) (some brackets in original and some added). *See also Annis v. First State Bank of Joplin,* 78 B.R. 962, 964 n. 4 (Bankr.W.D.Mo.1987) (holding that the hearsay contents of records and files in the case may not be rendered admissible by means of judicial notice); *Leslie v. Leslie,* 181 B.R. 317, 322 (Bankr.N.D.Ohio 1995) (holding that

hearsay may not be admitted pursuant to judicial notice); *One Hour Cleaners v. Industrial Claim Appeals Office,* 914 P.2d 501, 505 (Colo.Ct.App.1995) (holding that, while a court may take judicial notice of its records and files, it may not admit the facts stated within those documents if they are not "generally known or capable of accurate and ready determination"); Addison M. Bowman, *Hawaii Rules of Evidence Manual* § 201–2C (2d ed.1998) (noting that "entire court records will typically not qualify for judicial notice, containing as they do much material that is disputed and not indisputable").

■ The director asserts that the circuit court's taking judicial notice was proper in this case in light of "the statutory framework for determinations of fitness and penal responsibility under which the circuit court was operating," Director's Answering Brief at 18, and observes that HRS § 704–405, *see supra* note 5, contemplates the admission of the medical examiners' reports notwithstanding the hearsay rules. However, the director fails to apprehend that the instant proceeding is independent of, and only indirectly related to, the proceedings regarding Kotis's fitness to proceed. By its own terms, HRS § 704–405 applies to the "[d]etermination of fitness to proceed" and not to *any* issue that might be raised incident to the director's custody of a defendant *after* such a determination has been made. It is well established that evidence may be admissible for certain kinds of hearings but not for others, even when both hearings are part of the same criminal proceeding. *See Thompson v. Yuen,* 63 Haw. 186, 190, 623 P.2d 881, 884 (1981) (noting "the distinction between the adversary proceedings to determine guilt or innocence and the disposition phase of the proceeding[,] which allows for different application of the rules of evidence") (citing *State v. Nobriga,* 56 Haw. 75, 527 P.2d 1269 (1974)). The legislature has not provided for a comparable waiver of the hearsay rules for purposes of proceedings regarding the involuntary administration of antipsychotic medication. Accordingly, the general rule articulated in HRE Rule 101 (1993) (providing that the HRE "govern proceedings in the courts of the State of Hawaii, to the extent and with the exceptions stated in rule 1101") and

HRE Rule 1101(b) (1993) (providing that the HRE "apply generally to civil and criminal proceedings") applies, and the rules proscribing, *inter alia*, hearsay, *see* HRE Rule 802 (1993), must be given full effect.[26]

More cogently, however, the director urges that, by failing to interpose a timely objection, Kotis effectively waived his opportunity, pursuant to HRE Rule 201(e), to induce the circuit court to clarify its statement that it took "judicial notice of the records and files in this case." Accordingly, the record is unclear as to the extent of the judicial notice taken and for what purposes the various "records and files" in the record were considered. As discussed above, taking judicial notice of the records and files of a case may or may not be proper, depending upon the type of record at issue and the purpose for which it is considered. For example, it would have been perfectly appropriate for the circuit court to take judicial notice of the existence and contents of its own order appointing a GAL in support of FOF No. 1 regarding the propriety of that appointment. Inasmuch as this court resorts to plain error analysis cautiously, *see, e.g., State v. Lee*, 83 Hawai'i 267, 274, 925 P.2d 1091, 1099 (1996) ("This court's power to deal with plain error is one 'to be exercised sparingly and with caution because the rule represents a departure from a presupposition of the adversarial system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.'" (Quoting *Raines v. State*, 79 Hawai'i 219, 226, 900 P.2d 1286, 1293 (1995) (quoting *State v. Kupau*, 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994).), and *State v. Fox*, 70 Haw. 46, 56, 760 P.2d 670, 675–76 (1988)))), it should refrain from speculating as to whether the circuit court relied upon "hundreds of pages" of hearsay in arriving at its ruling on the director's motion; rather, we should presume, absent an indication in the record to the contrary, that the circuit court took judicial notice only where appropriate. *Cf. supra* section III.D.

We must acknowledge, however, that it appears that the circuit court relied upon the contents of at least several documents in the record that were not court orders. With regard to FOF No. 5, for example, the circuit court expressly referenced the reports of the fitness panel. The circuit court's error in this regard, however, was arguably harmless, inasmuch as its finding that Kotis "suffers from a mental disease, disorder, or defect" was not, in and of itself, a component of the *Riggins* test. FOF No. 6, on the other hand, concerned the circuit court's related finding that the director's treatment plan was "medically appropriate," a finding that *is* a critical element of the *Riggins* test. *See supra* section III.B. In this regard, FOF No. 6 made express reference to Dr. Patel's report. Furthermore, the circuit court's questioning of Dr. Brown at trial indicates that it regarded Dr. Brown's opinion concerning Kotis's dangerousness and the appropriateness of the treatment plan as constituting the "minority" opinion among the physicians who had assessed Kotis and the appropriate treatment plan, including those who had submitted reports for the purpose of the fitness proceedings but who did not testify at the hearing.

Inasmuch as the opinions and facts set forth in the various medical reports were neither "generally known within the territorial jurisdiction of the trial court" nor "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," they were not a proper subject of judicial notice. Moreover, as out-of-court statements, the contents of the reports constituted inadmissible hearsay. *See* HRE Rules 801 (1993) (defining hearsay) and 802 (1993) (providing that hearsay is generally inadmissible).

The remaining question, therefore, is whether the admission of the reports constituted *plain* error.

It is the general rule that evidence to which no objection has been made may

---

26. There are, of course, some proceedings, even those incident to a criminal prosecution, in which *none* of the HRE apply. *See* HRE Rule 1101(d) (1993) (providing that, with the exception of privileges, the HRE do not apply, *inter*

*alia*, in preliminary hearings, bail hearings, and sentencing hearings). In those proceedings, therefore, the restrictions on judicial notice imposed by HRE Rule 201 would be inapplicable.

properly be considered by the trier of fact and its admission will not constitute a ground for reversal. It is equally established that an issue raised for the first time on appeal will not be considered by the reviewing court. *Only where the ends of justice require it, and fundamental rights would otherwise be denied, will there be a departure from these principles.* [Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1994)].

*Wallace*, 80 Hawai'i at 410, 910 P.2d at 723 (quoting *State v. Naeole*, 62 Haw. 563, 570–71, 617 P.2d 820, 826 (1980)(some citations omitted)) (brackets in original) (emphasis added).

In *Wallace*, this court held that the admission of testimony regarding the weight of cocaine, although erroneous (inasmuch as insufficient foundation had been laid regarding the accuracy of the scale used to weigh the cocaine), did not rise to the level of plain error. *Id.* Similarly, in *Naeole*, this court held that the erroneous admission of testimony regarding pretrial photographic identifications was insufficiently serious to constitute plain error. 62 Haw. at 570–71, 617 P.2d at 826. Closer to the facts at bar, in *Tabieros*, 85 Hawai'i at 379 n. 29, 944 P.2d at 1322 n. 29, this court rejected the appellant's hearsay challenge to an accident report admitted at trial without objection. *See also State v. Hoglund*, 71 Haw. 147, 150–51, 785 P.2d 1311, 1313 (1990) (declining to address the defendant's argument, raised for the first time on appeal, that the trial court had erred in admitting a traffic abstract to provide his prior conviction).

In light of the foregoing precedent, we do not believe that the admission of the medical reports violated Kotis's "fundamental rights." Kotis had the opportunity to call any of the physicians involved in the case as witnesses at the hearing and failed to do so. Accordingly, the circuit court did not commit plain error in considering the reports.

### F. There Was Substantial Evidence Supporting The Circuit Court's Relevant FOFs.

Kotis urges that the circuit court lacked substantial evidence to support its FOFs that Kotis was dangerous to himself and to others, that the treatment plan was medically appropriate and essential, and that alternative treatments would be inadequate.

#### 1. There was substantial evidence that Kotis was dangerous to himself.

 Kotis rightly points out that Dr. Shibata's opinion testimony on the subject of Kotis's dangerousness was highly equivocal. Dr. Shibata testified that Kotis "*may* pose a *possible* danger to others," but that "[t]here's no empirical way of measuring or predicting future dangerousness." Distressingly, Dr. Shibata also appeared to indicate that he had based his opinion of Kotis's dangerousness to others, at least in part, on the fact, *per se*, that Kotis had been *charged* with kidnapping. Moreover, Dr. Shibata testified that he did *not* believe Kotis to be imminently suicidal, but opined that there was a "possibility" that, due to a mood swing, he *might* become suicidal in the future.

 Kotis is correct that, if the foregoing opinion testimony had represented the full extent of the evidence before the circuit court, it might well have been insufficient to support the FOFs. In addition to his opinion testimony, however, Dr. Shibata testified to *facts* relevant to the question of Kotis's dangerousness to himself. Dr. Shibata testified that Kotis had "made statements about thoughts of dying, thoughts of committing suicide," and that he had "made several statements about possibly hanging himself, getting the police to shoot him."[27] It is not perfectly clear from the context of Dr. Shibata's testimony whether he learned of Kotis's statements from his review of the medical records or whether Kotis made the state-

---

27. Dr. Shibata also testified, over Kotis's objection, that he had read in unspecified medical reports that Kotis had threatened Dr. Brown. Moreover, Dr. Shibata testified that "[m]edical reports show that he's ... required to be put in seclusion at Hawaii State Hospital because of his head banging against the walls and required emergency medication at that time to decrease his agitation[.]" As Kotis's trial counsel rightly pointed out, however, Dr. Shibata's testimony as to these matters was admissible solely to demonstrate the basis of his expert opinion. *See Tabieros*, 85 Hawai'i at 384, 944 P.2d at 1326 (holding that "an expert witness [may] reveal[ ], in the course of direct examination, the contents of the materials upon which he or she has reasonably relied—hearsay though they may be—*in order to explain the basis of his or her opinion* " (citing

ments directly to Dr. Shibata during one of his several meetings with Kotis. Nevertheless, the circuit court could rationally have inferred that the gist of Dr. Shibata's testimony was that Kotis had made the statements directly to him. Accordingly, Kotis's statements were admissible for the truth of the matters asserted, pursuant to HRE Rule 803(a)(1) (1993).[28] These statements alone constitute substantial evidence to support the circuit court's FOF that Kotis was dangerous to himself. Moreover, each of the medical examiners who submitted reports in connection with the fitness proceedings (which must be considered "competent evidence" although erroneously admitted, *see supra* section III.E) opined that Kotis was dangerous both to himself and to others. Accordingly, the circuit court's FOFs regarding Kotis's dangerousness were not clearly erroneous.

> 2. *There was substantial evidence to support the circuit court's FOFS that the medication treatment plan was medically appropriate and, in light of the inadequacy of less intrusive alternatives, essential to address Kotis's dangerousness.*

 Kotis asserts, without argument, that there was insufficient evidence to support the circuit court's finding that the director's proposed treatment plan was medically appropriate. However, Dr. Shibata testified that, in his opinion, the proposed medications would "decrease ... mood swings" and render Kotis "more stable emotionally, which would greatly reduce the possibility of suicide." Moreover, Dr Shibata expressly testified that he believed the director's treatment plan to be medically appropriate and "standard" for Kotis's condition.

Furthermore, Dr. Shibata expressly testified that, in his medical opinion, he believed the plan to be essential for Kotis's safety and that the other modalities of treatment that he had considered—behavior modification and psychotherapy—are "not [ ]very effective when somebody is having psychotic delu-

sions." Kotis complains that Dr. Shibata offered insufficient details regarding the alternative treatments he considered; however, he fails to suggest what amount of detail would have been necessary. In any event, this court's task is not to determine whether the evidence was "clear and convincing," but, rather, whether there was sufficient evidence to enable a person of reasonable caution to arrive at the circuit court's FOF. *See Roxas*, 89 Hawai'i at 116, 969 P.2d at 1234 (citations omitted). It appears to us that Dr. Shibata's testimony meets that test.

Accordingly, Kotis's argument that there was insufficient evidence to support the circuit court's FOFs fails.

### IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's order.

---

HRE Rules 703 (1993)) and 705 (1993) (emphasis added)).

28. HRE Rule 803(a)(1) provides in relevant part that "[a] statement that is offered against a party

and is ... the party's own statement" is "not excluded by the hearsay rule, even though the declarant is available as a witness[.]"