**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000378
30-NOV-2016
09:12 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MICHAEL ROBERT LAWRENCE, Defendant-Appellant
and
DIRECTOR OF HEALTH, DEPARTMENT OF HEALTH, STATE OF HAWAI'I,
Party-in-Interest-Appellee.

NO. CAAP-14-0000378

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 99-0-0675)

NOVEMBER 30, 2016

NAKAMURA, C.J., and FOLEY and LEONARD, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Michael Robert Lawrence (Lawrence) with the second-degree murder of Melchor Talaro Tabag (Tabag). Lawrence killed Tabag, a vacuum cleaner salesperson who had been demonstrating products at Lawrence's home, by striking Tabag in the head with a hammer and stabbing him in the neck and chest.

Lawrence subsequently dismembered Tabag's body. In 2002, after a jury-waived bench trial, the Circuit Court of the First Circuit (Circuit Court)[1] found Lawrence not guilty of second-degree murder by reason of physical or mental disease, disorder, or defect. Based on testimony that Lawrence presented a risk of danger to others, the Circuit Court ordered him committed to the custody of the Director of the Department of Health (Director) to be placed in an appropriate institution for custody, care, and treatment. The Circuit Court entered its "Judgment of Acqutial and Commitment" which reflected these rulings on April 3, 2002.

On December 18, 2013, the Director filed a motion for an order authorizing the involuntary administration of psychotropic medication to Lawrence. The motion was based on a request by Thomas L. Cook, M.D. (Dr. Cook), Lawrence's treating psychiatrist at the Hawai'i State Hospital. After an evidentiary hearing, the Circuit Court[2] granted the motion and filed its "Order Granting [Director's] Motion for an Order Authorizing the Involuntary Administration of Medication" (Medication Order) on December 26, 2013.

Lawrence appeals from the Medication Order. On appeal, Lawrence contends that the Circuit Court erred in issuing the Medication Order because there was insufficient evidence to support it. We disagree and affirm the Circuit Court.

BACKGROUND

I.

In the morning of March 27, 1999, Tabag, a vacuum cleaner salesperson, demonstrated his products to Lawrence at a home that Lawrence shared with his parents. Lawrence's mother later saw Tabag's body lying on the floor with a stream of blood on his left forehead. Lawrence was there and was holding a hammer in his right hand. Lawrence's mother became scared and

---

[1] The Honorable Virginia Lea Crandall presided.

[2] The Honorable Richard K. Perkins presided.

locked herself in her bedroom. Lawrence left the residence with Tabag's body and drove away in Tabag's car.

The police later arrested Lawrence after seeing him drive into a gas station in Tabag's car. From the car, the police recovered a dagger type knife, bone saw, and claw hammer which appeared to have blood on them. The bone saw also appeared to have flesh and hair on it. Lawrence later admitted that he had "chopped up" Tabag's body and stated that he felt "high" when he killed Tabag.

The State filed a criminal Complaint against Lawrence, charging him with the second-degree murder of Tabag. After a jury-waived bench trial, the Circuit Court found that the State proved beyond a reasonable doubt that Lawrence "struck Melchor Tabag on the head with a hammer, stabbed him in the neck and chest, and caused the death of Melchor Tabag"; that Lawrence engaged in this conduct intentionally or knowingly; and that Lawrence intended or knew that his conduct would result in Tabag's death.

The Circuit Court, however, further found that Lawrence was not guilty of the charged second-degree murder by reason of physical or mental disease, disorder, or defect. The Circuit Court ruled that Lawrence had proven by a preponderance of the evidence the affirmative defense that (1) at the time of the charged offense, he was suffering from a physical or mental disease, disorder, or defect; and (2) as the result of such physical or mental disease, disorder, or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law (hereinafter, the "insanity defense"). In support of its insanity defense ruling, the Circuit Court cited the opinions of mental health experts who treated or examined Lawrence that Lawrence suffered from schizophrenia and that he believed killing Tabag was part of his "mission." To support its finding that Lawrence suffered from schizophrenia and was not malingering, the

Circuit Court cited evidence that while in custody after his arrest, Lawrence's symptoms improved after the administration of anti-psychotic medication, but that six weeks after the medication was stopped, Lawrence showed psychotic symptoms which included "uncontrollable thoughts to chop up people[,]" and that Lawrence's symptoms again improved when the medication was resumed. The Circuit Court found that Lawrence had proven by a preponderance of the evidence that

> at the time of the alleged offense, the Defendant was acting pursuant to a delusion as to his mission and that he lacked substantial capacity to appreciate the wrongfulness of his conduct and that he lacked substantial capacity to conform his conduct to the requirements of the law, due to a physical or mental disease, disorder or defect.

Accordingly, the Circuit Court adjudged Lawrence not guilty based on his insanity defense. In addition, based on the testimony that Lawrence presented a risk of danger to others, the Circuit Court ordered that Lawrence be "committed to the custody of the Director . . . to be placed in an appropriate institution for custody, care and treatment." On April 3, 2002, the Circuit Court entered its Judgment of Acquittal and Commitment, which acquitted Lawrence based on his insanity defense and ordered him committed to the custody of the Director, pursuant to Hawaii Revised Statutes (HRS) § 704-411(1)(a) (1993).[3]

---

[3] When the Circuit Court entered its Judgment of Acquittal and Commitment, HRS § 704-411(1)(a) provided, in relevant part:

> (1) When a defendant is acquitted on the ground of physical or mental disease, disorder, or defect excluding responsibility, the court shall, on the basis of the report made pursuant to section 704-404, if uncontested, or the medical or psychological evidence given at the trial or at a separate hearing, make an order as follows:
>
> (a)   The court shall order the defendant to be committed to the custody of the director of health to be placed in an appropriate institution for custody, care, and treatment if the court finds that the defendant presents a risk of danger to oneself or others and that the defendant is not a proper subject for conditional release; . . . .

4

II.

From the time that the Circuit Court entered its Judgment of Acquittal and Commitment in 2002, Lawrence has remained in custody, either at the Hawai'i State Hospital (HSH) or at the Halawa Correction Facility (Halawa). Lawrence was apparently prosecuted for assaulting an HSH physician in 2008, and he was incarcerated at Halawa until November 2013. Lawrence has a history of violent behavior while in custody, and the Circuit Court has issued a series of orders authorizing his involuntary medication.

A.

On December 12, 2007, while Lawrence was committed at HSH, the Director filed the first motion for an order authorizing the involuntary administration of medication to Lawrence. The motion asserted that Lawrence's inconsistency in taking, and his refusal to take, medication had resulted in "aggressive, assaultive and dangerous behaviors which renders him an imminent danger to other patients and staff at HSH." The Director's proposed treatment plan described numerous incidents of Lawrence's violent behavior as well as his delusional thoughts, including Lawrence's attacking multiple patients without provocation, making threats against patients and staff, and maintaining a belief that his "work" included the killing of others. The most recent incident described in the proposed treatment plan occurred on December 1, 2007. During that incident, Lawrence made threatening comments to HSH staff, and when staff members approached him to offer emergency medications, Lawrence refused to take the medications, and an altercation ensued. Lawrence hit several staff members, and as a result of the altercation, four staff members suffered injuries, including broken ribs, dental damage, facial bruising and neck strain, and a dislocated shoulder.[4]

---

[4] In addition to the December 1, 2007, incident, the proposed treatment plan described the following incidents: On November 23, 2007, Lawrence was

(continued...)

The Circuit Court issued an order granting the State's motion on December 19, 2007, finding, among other things, that Lawrence was "dangerous to others in that he has threatened and assaulted staff members and other patients[.]" The Circuit Court's 2007 order authorized the involuntary administration of medication to Lawrence until December 19, 2008. Lawrence did not appeal the 2007 order.

B.

On December 11, 2008, the Director filed a second motion for an order authorizing the involuntary administration of medication to Lawrence based on his "continued violent and assaultive behaviors towards others." In support of the motion, the Director asserted that Lawrence continued to refuse medications and detailed two specific incidents of violence engaged in by Lawrence in 2008. In one incident, Lawrence, shortly after being released from restraints, punched another patient in the head four or five times, without provocation, and stated he would do so again in the future. In the second incident, again without provocation and without any signs that he was upset or angry, Lawrence repeatedly punched an HSH staff physician in the head and face after the physician had completed a physical examination of Lawrence.

On December 19, 2008, the Circuit Court issued an order granting the State's motion, which authorized the involuntary administration of medication to Lawrence until December 19, 2009. Lawrence did not appeal the 2008 order.[5]

---

[4] (...continued) found by a nurse holding another patient in what Lawrence referred to as a choke hold position, and Lawrence said he planned to "choke him . . . out[.]" On November 17, 2007, Lawrence assaulted another patient, and Lawrence stated that "he better respect me or he's gonna get it." On October 18, 2007, Lawrence assaulted another patient with no apparent provocation. On September 23, 2007, Lawrence made threats to another patient and staff and attempted to assault a staff member. On September 16, 2007, Lawrence assaulted another patient without provocation. On April 30, 2007, Lawrence assaulted another patient. On April 9, 2007, Lawrence assaulted another patient.

[5] On March 9, 2009, after a further hearing, the Circuit Court issued an order amending its 2008 order authorizing the involuntary administration of
(continued...)

C.

Lawrence was apparently prosecuted for assaulting the HSH physician during the 2008 incident. He was incarcerated at Halawa and remained there until November 2013. Lawrence's psychiatric records from Halawa indicate that he was "delusional, depressed, and had homicidal ideations at times," and that a psychiatrist had determined that high doses of antidepressant and antipsychotic medications were necessary. Lawrence, however, consented to take and was compliant with his prescribed medications while at Halawa, and therefore, no order authorizing the involuntary administration of medication had been sought while he was at Halawa.

D.

On November 29, 2013, Lawrence was returned to HSH from Halawa. Immediately upon Lawrence's return, he refused all psychotropic medications. "Lawrence refused to sign all paperwork including the consent to receive medication[,]" stating that "[m]edications don't do anything for me. I've learned to be good without them." Despite these assurances, Lawrence began engaging in threatening behavior from the day of his return.

Lawrence engaged in three threatening incidents that involved Mario Espenal (Espenal), a psychiatric technician assigned to Lawrence's unit, Unit H.[6] Espenal had no contact with Lawrence prior to Lawrence's readmission to HSH on November 29, 2013.

In the first incident, which occurred on the day Lawrence was readmitted to HSH, Espenal asked Lawrence to step outside Lawrence's room so Espenal could unlock the bathroom door. Lawrence complied, but later approached Espenal and

_____

[5] (...continued)
medication to Lawrence to include the involuntary administration of electroconvulsive therapy. Lawrence did not appeal the 2009 amended order.

[6] Unit H is an Administrative Segregation Unit, which "is a unit designed for those inmates . . . considered dangerous among the regular unit population."

stated, "I don't know you, but I didn't like the way you told me to step out of my room. Didn't like the way you spoke to me." Lawrence then paused, looked Espenal directly in the eyes, and said, "Don't do it again." Based on Lawrence's tone and confrontational manner, Espenal felt threatened, and based on Espenal's background and training, he interpreted Lawrence's statements as a threat. Espenal activated his PMT emergency alarm system, which sent out a hospital-wide distress call. When Lawrence saw what Espenal was doing, he said, "Go ahead and push your little PMT alarm[,]" smirked at Espenal, and went back in his room.

The second incident occurred on December 11, 2013. Espenal observed Lawrence standing in a line talking to a staff member whom Lawrence appeared to know. Lawrence greeted the staff member and then told him, "Hey, you better put these new guys in check . . . before I catch another murder charge." Lawrence emphasized the last part of this remark. Espenal interpreted Lawrence's statement to be directed at Espenal and other new staff members in Unit H.

The third incident occurred on December 12, 2013. Espenal observed Lawrence become upset when a female staff member advised Lawrence that he could not do his laundry. Lawrence told the female staff member, "Fuck you, Bitch . . . . I'm gonna do my laundry anyway" and attempted to walk past her. Another staff member closed the access door, and an additional staff member arrived. Lawrence then relented, but as he walked away, he looked at Espenal and the female staff member and said, "You'll see what's gonna happen to you." Espenal viewed Lawrence's statement as a threat.

In addition to the three incidents involving Espenal, a search of Lawrence's room on December 11, 2013, revealed that he was concealing contraband in his room. The search was prompted by reports of missing pens, which were a cause for concern because in Lawrence's unit, "any sharp object can be considered a weapon." During the search, two pens and a highlighter were

8

found in Lawrence's room as well as other contraband, including staples, a metal earring, a cord made of various fabrics, and small plastic bags. Plastic bags are considered contraband because they can be tied together to form a cord or noose. Patients in Unit H are informed that they are not allowed to keep pens and cords. Lawrence denied that the contraband found in his room had been there before the search was conducted.

III.

A.

On December 18, 2013, the Director filed a third motion for an order authorizing the involuntary administration of medication based on concerns regarding Lawrence's dangerousness. Attached to the motion was a proposed treatment plan prepared by Dr. Cook, a Staff Psychiatrist and Lawrence's treating psychiatrist at HSH. In the proposed treatment plan, Dr. Cook recounted Lawrence's violent and dangerous behavior during his prior commitment at HSH:

> This is [Lawrence's] third time at Hawaii State Hospital. Formerly, Mr. Lawrence exhibited frequent violence towards staff and peers. In the course of 2007 he assaulted staff and other patients at least eight times, and often when he had just been taken out of restraints. He spoke of punching other patients as a "job" that he was hired to do. He spoke of a list of one hundred people he intended to kill. At times he said he was a "hit man" hired by the Hawaii State Hospital, and he spoke as if he was on staff at the hospital. He had at one time snuck into another patient's room, and was found lying on another patient's back, holding him in a choke hold. When interviewed later, he said he had trouble deciding whether to rape or kill him.

Dr. Cook reported that since being readmitted to HSH on November 29, 2013, Lawrence had tested unit rules by asking other patients for their food wrappers, had spoken in a grandiose manner similar to his prior admissions, and had boasted about "sneaking [drugs] into prison." Dr. Cook also described the November 29, 2013, threat against Espenal. Dr. Cook stated that "due to [Lawrence's] current presentation and his considerable history of violence, it is not possible to treat him safely without medication."

Dr. Cook's proposed treatment plan described the effects of various recommended medications, including antipsychotic medications, that may be used to treat Lawrence, and contained the following analysis:

**4. Medical Appropriateness of Recommended Medications:**

The above-recommended medications are current standards of care and are used to treat patients with psychotic symptoms, mood symptoms, and agitation. These medications, singly or in combination, should stabilize Mr. Lawrence's dangerous behavior and psychiatric symptoms, enabling the patient to participate in treatment to restore baseline level of functioning and return safely to the community on conditional release.

**5. Less Restrictive Alternatives:**

Other alternative, less intrusive treatments such as supportive one-to-one therapy, milieu therapy, the token economy, and Mall program have not been sufficient to restore baseline level of functioning and for safe return to the community. These interventions may be efficacious in conjunction with medication, but are not effective substitutes for medication.

**6. Specific Medications or Treatment Are Essential for the Patient's Safety and for the Safety of Others:**

The patient's dangerous behaviors are most likely exacerbated by mental illness and are not likely to improve or stabilize without treatment.

Untreated mental illness often becomes refractory. In addition, current evidence supports the view that untreated psychotic symptoms are associated with irreversible cell loss in the brain that medications can prevent. Evidence has shown that prognosis for function decreases in direct correlation with duration of time psychotic symptoms remain untreated.

The proposed treatment plan concluded by stating:

Mr. Lawrence has a long term delusional belief that he is a hit-man with a mandate to kill one hundred people. He was demonstrably dangerous before at our hospital and at Halawa he was taking medication that he is now refusing to take. He is again talking in a grandiose fashion and testing limits with us. He has behaved dangerously already.

It is my professional opinion he will become violent soon, and that he cannot be safely treated without medication.

(Formatting altered.)

B.

The Circuit Court held a hearing on the Director's 2013 motion on December 26, 2013, during which the Director presented

10

the testimony of Espenal and Dr. Cook, and Dr. Cook's proposed treatment plan was admitted in evidence. Lawrence did not present any of his own evidence.

At the hearing, Espenal testified about the three incidents concerning Lawrence. Dr. Cook, who the parties stipulated was an expert in the field of psychiatry, provided his medical opinion that the proposed treatment plan was necessary and appropriate. Dr. Cook explained his concerns regarding Lawrence's dangerousness, confirmed that the recommended medications in the proposed treatment plan were medically appropriate, and explained why less intrusive alternatives were insufficient.

With respect to the danger posed by Lawrence, Dr. Cook testified that "previous acts of violence [were] the highest indicator of risk of future acts of violence." Dr. Cook referenced Lawrence's history of violence, including numerous assaults during Lawrence's prior commitment at HSH and recent incidents involving Espenal, which Dr. Cook characterized as cold or veiled threats of assault, and the discovery of prohibited contraband in Lawrence's room. Dr. Cook also referenced Lawrence's "whole clinical picture," the diagnosis of a disorder that includes psychosis with agitation, and Lawrence's recent refusal to take psychotropic medications upon readmission to HSH after having been compliant in taking such medications while incarcerated at Halawa.

As to medical appropriateness, Dr. Cook confirmed that the proposed treatment plan, which identified recommended medications, including antipsychotic medications, was "the only effective treatment" to forestall dangerousness. While acknowledging that in addition to their positive therapeutic benefits, the proposed medications had potentially adverse side effects, including some life-threatening conditions, Dr. Cook opined that the recommended medications were appropriate for Lawrence's treatment.

Dr. Cook further opined that less intrusive alternatives were either unavailable or would be ineffective. Dr. Cook identified seclusion and restraints as possible less intrusive alternatives, but explained that these alternatives, unlike medication, would not treat Lawrence's diagnosis. Dr. Cook also identified milieu therapy, animal therapy, recreational therapy, and psychotherapy as less intrusive alternatives, but noted that these alternatives, without medication, would be insufficient to treat Lawrence's psychosis and could only be used after the safety concerns presented by Lawrence were addressed.

The Circuit Court granted the Director's motion and issued the Medication Order on December 26, 2013. In the Medication Order, the Circuit Court found that: (1) Lawrence "is mentally ill in that he suffers from Schizoaffective Disorder, Most Recently Depressed, Poly Substance Dependence (Methamphetamine and Alcohol) in Remission in a Controlled Environment, Poly Substance Abuse (Cannabis, Cocaine) in Remission, and Antisocial [P]ersonality Disorder"; (2) Lawrence "is dangerous to others in that he has threatened to assault staff"; (3) the treatment plan proposed by Dr. Cook for Lawrence "is medically appropriate and the treatment described in the plan is in [Lawrence's] medical interest"; and (4) "[e]ven considering other less intrusive treatment alternatives, . . . involuntary administration of antipsychotic medication to [Lawrence] is essential to forestall [Lawrence's] danger to others, and is in [Lawrence's] best interest." Based on these findings, the Circuit Court granted the Director's motion and authorized the involuntary administration of medication in accordance with the treatment plan for one year, until December 26, 2014, subject to further order of the Circuit Court. Lawrence appeals from the Medication Order.[1]

---

[1] Although the Medication Order terminated on December 26, 2014, Lawrence argues, and we agree, that our review of the issues involved in this appeal is not precluded on the ground of mootness. Lawrence has been committed to the custody of the Director for an indefinite period and is likely subject to future requests by the Director for involuntary medication.
(continued...)

DISCUSSION

I.

At the outset, we consider whether the Medication Order is an appealable order such that we may exercise jurisdiction over this appeal.[8] The Hawai'i Supreme Court has implicitly held that orders regarding the involuntary medication of a pretrial defendant and orders relating to the release or commitment of a defendant found not guilty based on an insanity defense are appealable orders by exercising appellate jurisdiction over such orders. For example, in State v. Kotis, 91 Hawai'i 319, 984 P.2d 78 (1999), the supreme court exercised appellate jurisdiction and reviewed an order authorizing the involuntary administration of antipsychotic medications to a defendant found incompetent to proceed to trial. In State v. Miller, 84 Hawai'i 269, 933 P.2d 606 (1997), the supreme court reviewed an order denying the motion of a defendant found not guilty based on an insanity defense for conditional release or discharge from custody, and in State v. Burgo, 71 Haw. 198, 787 P.2d 221 (1990), the supreme court reviewed an order revoking the conditional discharge of a defendant found not guilty based on an insanity defense. Although the supreme court did not specifically address appellate jurisdiction in these cases, it presumably would not have decided the cases on the merits if the contested orders were not appealable.[9]

A.

Lawrence appeals from the Medication Order pursuant to HRS § 641-11 (Supp. 2015), which provides, in relevant part:

---

[7] (...continued)
See Washington v. Harper, 494 U.S. 210, 218-19 (1990) (holding that the cessation of involuntary medication did not render a prisoner's case moot, as he continued to suffer from schizophrenia and it was likely that involuntary medication of the prisoner with antipsychotic drugs would recur, but for the decision being reviewed).

[8] We issued an order directing the parties in this case to address the issue of appellate jurisdiction in their appellate briefs.

[9] The supreme court in these cases did not indicate that it was exercising appellate jurisdiction on some basis unique to the supreme court.

> Any party aggrieved by the judgment of a circuit court in a criminal matter may appeal to the intermediate appellate court, subject to chapter 602, in the manner and within the time provided by the rules of court. The sentence of the court in a criminal case shall be the judgment.

As this case illustrates, a defendant found not guilty based on an insanity defense may be committed to the custody of the Director and thereby suffer the deprivation of his or her liberty for a prolonged, and indeed an indefinite, period of time. We conclude that a judgment of acquittal and commitment based on an insanity defense, as was entered against Lawrence in this case, constitutes a "sentence" for purposes of HRS § 641-11, and accordingly, the Medication Order constitutes an appealable post-judgment order.

Our conclusion is consistent with Miller and Burgo, in which the supreme court exercised appellate jurisdiction over post-judgment orders issued after the defendants were found not guilty based on an insanity defense and were committed to the custody of the Director. Our conclusion is also consistent with the decisions of other jurisdictions that have held that the commitment of a defendant following an insanity acquittal constitutes a "sentence" or should be treated as a sentence. See In re Personal Restraint of Well, 946 P.2d 750, 752-73 (Wash. 1997) (concluding that an order of commitment imposed on a defendant after he was acquitted by reason of insanity constituted a "sentence" and a "judgment"); Connelly v. Commissioner of Correction, 780 A.2d 903, 913 (Conn. 2001) (concluding that the time spent by a defendant in custody after he was acquitted by reason of insanity should be treated as a "sentence" for purposes of applying a statute providing credit for time served).[10]

---

[10] State v. Baxley, 102 Hawai'i 130, 73 P.3d 668 (2003), is distinguishable and does not require a contrary conclusion. In Baxley, the supreme court did not decide whether a judgment of acquittal and commitment based on an insanity defense constituted an appealable judgment under HRS § 641-11. Baxley, who was acquitted of Counts 1, 2, and 3 based on an insanity defense, argued that he should have been acquitted of Count 3 based

(continued...)

A post-judgment order is appealable in its own right if it meets the requirements of finality. See State v. Johnson, 96 Hawai'i 462, 469, 32 P.3d 106, 113 (App. 2001); Foo v. State, 106 Hawai'i 102, 102 P.3d 346 (2004) (reviewing a post-judgment order in a criminal case). Here, the Medication Order ended the post-judgment proceedings, leaving nothing further to be accomplished, and was a final order. See Johnson, 96 Hawai'i at 469, 32 P.3d at 113. As noted, a judgment of acquittal and commitment based on an insanity defense can result in prolonged deprivation of a defendant's liberty. In addition, the involuntary administration of medication constitutes a significant infringement on an individual's rights and interest in bodily integrity. It would be anomalous to construe HRS § 641-11 to preclude an appeal under the circumstances of this case. See Burgo, 71 Haw. at 202, 787 P.2d at 223 ("[T]his court will not interpret a statute in a manner which produces an absurd result.")

C.

We alternatively conclude that if a judgment of acquittal and commitment based on an insanity defense is not an appealable judgment under HRS § 641-11, then the Medication Order is appealable under the collateral order doctrine. This conclusion is consistent with Kotis, in which the supreme court reviewed an order, like the Medication Order, that authorized the involuntary administration of antipsychotic medication.

---

[10] (...continued)
on insufficiency of the evidence to prove the charge, rather than based on insanity. Id. at 131, 73 P.3d at 669. The supreme court concluded that because Baxley would remain in the custody of the Director of Health pursuant to his insanity acquittals on Counts 1 and 2, he could not show that he was aggrieved by the judgment entered on Count 3. Id. at 133-34, 73 P.3d at 671-72. The supreme court held that it lacked appellate jurisdiction to address Baxley's arguments because he was not aggrieved by the trial court's judgment, and not based on a conclusion that a judgment of acquittal and commitment based on an insanity defense was not a sentence or an appealable judgment under HRS § 641-11. The supreme court also held that it lacked jurisdiction over Baxley's challenge to the trial court's consideration of certain records in making its commitment decision because he failed to seek a post-acquittal hearing provided for in HRS § 704-411 to address the issue of dangerousness. Id. at 134-35, 73 P.3d at 672-73. The supreme court stated that the "proper route" was for Baxley to seek a post-acquittal hearing provided for by the statute. Id. at 135, 73 P.3d at 673.

An order is appealable under the collateral order doctrine "if it: (1) fully disposes of the question at issue; (2) resolves an issue completely collateral to the merits of the case; and (3) involves important rights which would be irreparably lost if review had to await a final judgment." State v. Baranco, 77 Hawai'i 351, 353-54, 884 P.2d 729, 731-32 (1994).

Here, the Medication Order fully disposes of the question of whether Lawrence can be subjected to involuntary medication, which is an issue completely collateral to the merits of his underlying criminal case. Moreover, if no final judgment was entered in Lawrence's case because his judgment of acquittal and commitment is not considered to be a "sentence" for purposes of HRS § 641-11, then Lawrence would never be able to obtain appellate review of the Medication Order, which overrides his right to refuse medication and his liberty interest in bodily integrity, if appellate review had to await the entry of a final judgment.

II.

We now turn to the merits of Lawrence's appeal. Lawrence contends that there was insufficient evidence to support the Medication Order. We disagree.

In Kotis, the Hawai'i Supreme Court established a three-part test that the trial court must apply in evaluating a request to involuntarily medicate a criminal defendant with antipsychotic drugs, where the request is based on a claim that the medication is necessary because the defendant poses a danger to himself or herself or others. In order to grant such involuntary medication request, the trial court must find: "(1) that the defendant actually poses a danger of physical harm to himself or herself or others; (2) that treatment with antipsychotic medication is medically appropriate, that is, in the defendant's medical interest; and (3) that, considering less intrusive alternatives, the treatment is essential to forestall the danger posed by the defendant." Kotis, 91 Hawaii at 334, 984 P.2d at 93.

The standard of review on appeal is whether there is substantial evidence in the record to support the trial court's findings regarding the three-part test. Id. at 328, 345, 984 P.2d at 87, 104. Based on the applicable standard of review, we conclude that there was sufficient evidence to support the Medication Order.

A.

The Circuit Court found that Lawrence "is dangerous to others in that he has threatened to assault staff[.]" This finding satisfied the first prong of the three-part test which requires the trial court to find "that the defendant actually poses a danger of physical harm to himself or herself or others[.]" There was substantial evidence in the record to support the Circuit Court's finding.

The record shows that Lawrence has a past history of extreme violence. His underlying criminal prosecution involved Lawrence's killing of Tabag by hitting him on the head with a hammer and stabbing him in the neck and chest, and then dismembering Tabag's body. While committed to HSH, Lawrence engaged in numerous assaults on other patients and staff, including an assault on an HSH physician for which he was apparently prosecuted and imprisoned at Halawa. Although Lawrence was compliant in taking prescribed antipsychotic medication while imprisoned at Halawa, he refused such medication upon his release from prison and readmission to HSH. Immediately upon his return to HSH, Lawrence engaged in threatening incidents described by Espenal, and Lawrence was also found with contraband in his room that could potentially be used as weapons.

Lawrence disputes the characterization of his conduct in the incidents described by Espenal as threats of violence, and Lawrence attempts to draw innocuous inferences from his behavior. However, matters concerning the weight and credibility of the evidence and the inferences to be drawn are for the trier of fact, State v. Kam, 134 Hawai'i 280, 287, 339 P.3d 1081, 1088 (Hawai'i App. 2014), and the Circuit Court found that Lawrence

17

"has threatened to assault staff." Lawrence also suggests that recent physical violence is required in order to find that he actually poses a danger of physical harm to others and that threatening conduct is not enough. Lawrence, however, provides no authority to support this suggestion. Lawrence's conduct in the incidents described by Espenal must be viewed in the context of Lawrence's long history of violence and the discovery of contraband that could be used as weapons in his room. We conclude that there was sufficient evidence to support the Circuit Court's finding of Lawrence's dangerousness to others and to satisfy the first prong of the three-part test.

B.

With respect to the two remaining prongs of the test, we conclude that there was substantial evidence to support the Circuit Court's findings: (1) that the proposed treatment plan is medically appropriate and in Lawrence's medical interest; and (2) that, considering less intrusive alternatives, the involuntary administration of antipsychotic medication to Lawrence is essential to forestall the danger he poses to others.

Dr. Cook, Lawrence's treating psychiatrist at HSH, was qualified, without objection, as an expert in the field of psychiatry, and his proposed treatment plan was introduced in evidence. In his proposed treatment plan, Dr. Cook provided an explanation of why the proposed treatment plan was medically appropriate, in Lawrence's medical interest, and essential to forestall the danger Lawrence posed to others. Dr. Cook opined, among other things, that the recommended medications, "singly or in combination, should stabilize Mr. Lawrence's dangerous behavior and psychiatric symptoms"; that less intrusive alternatives "are not effective substitutes for medication"; and that Lawrence's dangerous behaviors "are not likely to improve or stabilize without [the proposed] treatment."

At the hearing on the Director's motion, Lawrence deferred to Dr. Cook's expertise on matters relating to the second and third prongs of the three-part test. Lawrence's

counsel stated: "I'm not trying to make any argument that it was a less intrusive alternative means to achieve the results intended or that they proposed medications not appropriate. Uh, that's their ball park. I'm not, you know, trying to win the case on that -- on those issues." We conclude that there was sufficient evidence to support the Circuit Court's findings and to satisfy the second and third prongs of the three-part test.

CONCLUSION

Based on the foregoing, we affirm the Circuit Court's Medication Order.


On the briefs:

Taryn R. Tomasa
Deputy Public Defender
for Defendant-Appellant

Kimberly Tsumoto Guidry
First Deputy Solicity General
Department of the Attorney General
for Party-in-Interest-Appellee

*Craig H. Nakamura*

*Daniel R. Foley*

19